**In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 5, 1990.

Harley Riedel, Tampa, Fla., Oppenheimer Wolff & Donnelly, St. Paul, Minn., and Oppenheimer Wolff & Donnelly, Chicago, Ill., for debtor.

William Goldman, Brown & Wood, New York City, for creditors committee.

Kahn Consulting, Stewart J. Kahn, New York City, for movant.

ORDER ON APPLICATION FOR ALLOWANCE OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF OPPENHEIMER WOLFF & DONNELLY, P.A., BROWN & WOOD, P.A., STICHTER, RIEDEL, BLAIN & PROSSER, P.A., AND KAHN CONSULTING, INC., AS ACCOUNTANTS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a yet to be confirmed Chapter 11 case filed on November 10, 1989, or a year ago. The matters under consideration are four Applications for Interim Allowance by professionals:

1) Oppenheimer Wolff & Donnelly, P.A. (OWD), counsel of record for Bicoastal, d/b/a Simuflite, f/k/a The Singer Company (Debtor);

2) Stichter, Riedel, Blain & Prosser, P.A. (SRBP), co-counsel for the Debtor;

3) Brown & Wood (B & W), counsel for the Official Committee of Unsecured Creditors; and

4) Kahn Consulting, Inc. (KCI).

### Some Preliminary Remarks

In order to put these Fee Applications in proper focus, some preliminary remarks should be helpful. As noted earlier, this Chapter 11 case has been pending for over one year with no end in sight. When the Petition was filed in November 1989, it was represented to this Court that there would be no delays and that the Debtor would file a Disclosure Statement and a Plan at once. It was also represented that it was confident to obtain confirmation of its Plan, if not before the end of the year, at least by late January 1990. This expectation was obviously not only overly optimistic, but close to a pipedream. This is so because at the time the Petition for Relief was filed, the Debtor was already involved in several major litigations, two in the United States District Court in Maryland and one in the Southern District of New York. The suits in Maryland were filed by the United

States Government (Government), one under the False Claim Act, 31 U.S.C. § 3729, *et seq.*, generally referred to as the Urda or whistleblower suit, and the other by the Defense Logistics Agency of the Government (DLA). In the Urda suit, the Government sought to recover $70 million in damages and treble damages totalling in excess of $260 million. The amount sought by the DLA in its suit was over $142,300,000.00.

The suit in the Southern District of New York involved a controversy between the Debtor and CAE–Link Corporation (CAE), in which CAE sought a $140,500,000.00 adjustment of the purchase price it had already paid to the Debtor in connection with the purchase of the Link Simuflite division of the Debtor.

Of course, all these pending matters were well known to counsel for the Debtor who also knew, and certainly should have known, that until these matters are resolved, the Debtor will not be able to file a meaningful disclosure statement and, in turn, proceed to confirmation and successfully conclude this reorganization case. The fact of the matter is although so far the Debtor has filed three Disclosure Statements—four, if one considers a Supplement—none of them have been approved, and the confirmation of a Plan is still nowhere in sight.

The Applications under consideration cover somewhat different periods:

1) March 1—July 31, 1990, or five months by OWD;

2) November 10, 1989—August 10, 1990, or nine months by SRBP;

3) March 1—June 30, 1990, or four months by B & W; and,

4) May 1, 1990—July 31, 1990, or three months by KCI.

The record of this case reveals that during the relevant time there were ten court proceedings; two of them took up the entire morning, five of them took up the entire afternoon, and the balance were less than two hours in duration.

During the year, there were three adversary proceedings filed, all of which are still

waiting for final hearing, and the record does not reveal any serious activity in these adversary proceedings. In addition, there were several contested matters basically involving the Government's attempt to obtain a modification of the automatic stay or an order of abstention so that it could pursue the two suits pending in Maryland in the United States District Court. In addition, 3,558 claims have been filed, with 30—40 objections to claims, one of some significance involving the claim of HSSM #7, a Texas limited partnership, filed in the amount of approximately $43 million, and, of course, the Urda claim and the DLA claim, both filed by the Government. Basically, these are the highlights of what has transpired in this Chapter 11 case in the relevant time during which these professionals claim to have performed the services for which they now seek interim compensation for the periods indicated earlier.

### Application of Oppenheimer Wolff & Donnelly, P.A.

OWD, counsel of record for the Debtor, seeks compensation for services rendered during the period of March 1, 1990—July 31, 1990, or five months. This is the second Interim Application filed by this law firm. The first Application involved the period ending February 28, 1990, in which the firm sought an allowance of $940,830.50 in fees and $160,191.00 in expenses. On August 28, 1990, this Court entered an Order and awarded $566,615.40 in fees to the firm and $6,086.80 as reimbursement of expenses.

The current Application of OWD seeks an allowance of $1,147,325.50 and $176,054.40 as reimbursement of expenses. The fees sought break down to an award for services of $229,465.10 per month. Total hours billed as stated in the Application are 7,742.20 or approximately 1,550 hours per month or 350 hours per week. According to the Application, although sixteen partners, thirty-one associates and thirteen paraprofessionals worked on this case to one extent or another during the relevant time period, the major portion of services were rendered by ten partners, nine associates and one paraprofessional, totalling 5,990.7

hours or 77% of the total time spent. Rates charged by OWD are $160 to $230 for partners; $90—$190 for associates; and $55—$80 for paraprofessionals, or an average rate of approximately $148 per hour. According to the Fee Application, there were 47 attorneys working on this case during the relevant period, in addition to ten attorneys in the office of SRBP, local counsel for the Debtor.

The blended rates charged by OWD are more than reasonable, but one should not lose sight of the fact that OWD already has received an initial retainer of $243,862.25, and a previous allowance of $566,615.40 for fees on its first Interim Fee Application, or a total for eight months of approximately $101,309.70 per month.

As noted earlier, the Debtor is also represented by local counsel, SRBP, who also attended all court proceedings, together with at least one attorney from the firm of OWD. Thus, contrary to the contention of counsel, there were without doubt numerous hours of double billings and duplication of services.

When one views the entire history of this case, it is evident that this is a classic case of overkill by utilizing for the most part, the services of 29 attorneys during a nine-month period in connection with a Chapter 11 case of a Debtor, during which one has yet to see any meaningful progress toward a speedy conclusion of this reorganization of a Debtor which, with one exception, has no ongoing business operation. This Debtor is merely a parent of several non-debtor subsidiaries who are supposed to fund the reorganization of this Debtor, and the Debtor has only one operating division which it now seeks to sell.

The Interim Application of OWD recites in great detail the tremendous amount of time spent out of court on matters in a general sense, such as general corporate work; securities work (not involved in any litigation), environmental problems, and the like. This Court is unaware of any protracted litigation ongoing in any place, certainly not in this Court. The Application describes in great detail what is described

as the "Rauch Litigation." This apparently relates to a suit filed by the preferred shareholders against the Debtor in New Jersey, which suit, of course, came to a complete halt when the Debtor filed its Petition for Relief in this Court. This Court searched this record in vain to find even a minuscule activity in this Court concerning the "Rauch Litigation". It is hard to understand why OWD spent 1,126.6 hours during the five-month period, or more than 200 hours per month on this particular matter.

Exhibit A—P submitted by OWD contains a detailed description of the services rendered by the firm during the relevant period. The Application, which consists of 354 pages, describes the services rendered by OWD involving 16 different matters. The description includes 1) miscellaneous correspondence [sic]; 2) collation of miscellaneous material [sic]; 3) collation of materials; 4) a review of current bankruptcy issues [sic]; 5) discussions with Debtor's president of issues [sic]; and 6) joint counsel meetings. Just for the sake of illustration concerning the time spent by OWD, on March 13, 1990, OWD billed approximately 31 hours, almost $5,000.00 on the same day, and local co-counsel billed approximately 20 hours on the same day, basically for the same services.

The description of services furnished by OWD includes numerous hours spent on reviewing claims, spending 7.40 hours on this task, even though local co-counsel for the Debtor had more than ample and competent manpower to perform this, a basically routine task. For instance, an entry on March 19, 1990, again refers to a review of claims for 7.2 hours, plus 6.5 hours and a review of claims summary 4.5, almost 19 hours of claims review in one day. As stated earlier, these comments are made solely for the purpose of illustration and to point out whether or not the hours spent on these purely routine services were, in fact, time reasonably spent, without questioning whether these hours were, in fact, spent. These comments are not made lightly. This Court pored over this fee Application, which in sheer weight is the greatest ever filed in this Court, and examined same after many hours of careful scrutiny, and this Court cannot help but surmise that it was filed by OWD thinking the Court would be overwhelmed by the volume filed and cannot afford the time to clearly scrutinize the Application.

This Court is not unaware that no one objected to the Fee Application of OWD except the United States Trustee, who objected only to certain items of expenses for which reimbursement is sought. Of course, lack of objections to fee applications filed by professionals is without significance. No one can seriously question the basic proposition that the Court has the duty and the responsibility which it cannot shirk, and will not shirk, to make a close scrutiny of all fee applications and to disallow compensation sought for services for which the time spent by professionals in the Court's view is excessive and unreasonable, or if the hourly rate charged appears to be unreasonable even in the absence of any objections.

One last comment. OWD indicates on Page 29 of the Fee Application that this Court at least should allow in full the amount sought, without prejudice to its right to request additional compensation (apparently for the same time period), when this Court considers the final allowance. This Court is constrained to reject this proposition completely. It is the considered opinion of this Court that this request is preposterous and an unprecedented attempt to intimidate and to persuade this Court by the sheer volume of the Fee Application into accepting at face value the amount presently sought by OWD by expecting that this Court will not closely scrutinize the services rendered and the time claimed to have been spent on those services. This Court will not reconsider any previous allowance and must emphasize that the allowance made by this Order is the final determination by this Court of the reasonableness of the award made for the period in question and it is no longer open for re-examination by this Court.

This leaves for consideration the request for reimbursement of expenses by OWD in the amount of $160,191.00.

■ The largest amount sought as reimbursement for expenses is $68,504.71 expended for air fare by OWD. These expenses are fully documented and, while regrettably very substantial, should be allowed. However, this Court is unwilling to accept the proposition that copy charges, messenger services, and express mail are not overhead items, and thus, cannot be reimbursed. Of course, all unspecified expense items which are merely described as "other" equally cannot be recognized. Concerning charges for computer research, this Court is satisfied, as it stated repeatedly, that they are part of the general overhead expenses. *See In re Florida Brethren Homes, Inc.,* 97 B.R. 652 (Bankr.S.D. Fla.1989); *Matter of Pothoven,* 84 B.R. 579 (Bankr.S.D.Iowa 1988); *In re Cuisine Magazine, Inc.,* 61 B.R. 210 (Bankr.S.D.N.Y. 1986); *In re ICS Cybernetics, Inc.,* 97 B.R. 736 (Bankr.N.D.N.Y.1989). Based on the foregoing, this Court is satisfied that the total amount to be allowed to the law firm of OWD, as full compensation for its services for the period of March 1—July 31 is $850,000.00. In addition, the law firm is entitled to $109,077.93, for reimbursement of its expenses incurred during the relevant time.

### Fee Application of Stichter, Riedel, Blain & Prosser, P.A.

Local co-counsel for the Debtor, SRBP, seeks an allowance for its services during the period from November 10, 1989, up to and including August 31, 1990, or nine months in the amount of $566,370.00, less a $243,092.00 retainer already received, or $323,278.00. In addition, it seeks reimbursement of expenses in the amount of $45,875.73 for the same time period.

■ The amount sought represents 3,712 hours, representing an average hourly rate of $143.00 per hour. According to the Application, the bulk of the time was spent by Mr. Riedel, a senior partner in the firm, who bills at the rate of $190.00 per hour. As noted, in connection with the fee Appli-

cation of OWD, the other law firm representing the Debtor, the hourly rate charged by SRBP, is more than reasonable. However, this Court again has difficulty to accept the reasonableness of the number of hours spent, particularly in light of the fact that it is without doubt that there were duplications of services by OWD and SRBP, albeit not purposeful. For instance, this Court takes judicial notice of the fact that in almost every one of the court proceedings which took place before this Court, with some possible rare exception, both Mr. Riedel and Mr. Wheeler of OWD, were present even though several of the matters presented to this Court could have been handled easily by only one of them.

■ Considering the request for expense reimbursement by SRBP, the comments made in connection with the expense reimbursement request of OWD need not be restated and are equally applicable. This Court is unwilling to accept the proposition that in-house copy charges, even if charged at a reduced rate, delivery costs, mileage reimbursement, and postage costs, except when mailing is required by the Court, are not general overhead expenses. Equally, it is hard to accept the proposition that meal expenses for lunches and dinners are compensable items.

Based on the foregoing, this Court is satisfied that the reasonable value of the services rendered by co-counsel for the Debtor, the law firm of SRBP, is $490,-370.00, less the initial retainer of $243,-092.00, or a net balance of $285,000.00, together with reimbursement of expenses of $10,752.91.

### Application of Brown & Wood, P.A.

B & W was authorized by this Court to represent the Official Committee of Unsecured Creditors on January 16, 1990. On April 5, 1990, B & W filed its First Interim Fee Application and sought an allowance for its services rendered to the Committee during the period from December 5, 1989 up to February 28, 1990, in the amount of $360,058.90 and reimbursement of expenses in the amount of $53,699.57. On

August 28, 1990, this Court entered an order and awarded to B & W $251,678.17 for fees and reimbursement of expenses in the sum of $6,331.98. On September 10, 1990, B & W filed a Motion for Clarification of the Order. In its Motion, B.& W complained that this Court failed to make specific findings in its Order of August 28, 1990. The Court did consider the Motion for Clarification on November 20, 1990, made specific findings and entered an Order on the Motion and reaffirmed its award previously granted by the Order of August 28, 1990.

The Second Application for Interim Allowance seeks $368,227.40 for services rendered by B & W during the period from March 1, 1990, up to and including June 30, 1990, or four months. B & W also seeks a reimbursement for expenses of $61,182.61. The total hours claimed to have been spent by B & W are 2,341, or approximately 585 hours per month. The rate charged by B & W ranges from $115 to $350 per hour for attorneys and $52—$78 for paraprofessionals and managerial attorneys.

According to the Application, these services were performed by seven partners who charged a low of $270 to a high of $350 per hour and 17 associates at a rate ranging from a low of $115 to a high of $225 per hour. In addition, B & W also charged for the services of three summer associates and eight paralegals. Before analyzing the specifics set forth in the fee Application, certain comments are in order.

The role of counsel of the Official Committee of Unsecured Creditors is technically limited to the following:

1) Monitoring the Debtor's current operation of its business to assure that all rules imposed on the Debtor-in-Possession are observed; that the Debtor-in-Possession is not diminishing the estate; and that the management is honest and competent;

2) Evaluating any agreement of the Debtor-in-Possession to furnish adequate protection for the use of cash collateral or adequate protection in conjunction with stay litigation;

3) Analyzing any motion by the Debtor-in-Possession to obtain credit, prime liens, or grant superiority status;

4) Evaluating any disclosure statement and any proposed plan;

5) Evaluating the reasonableness of all applications for allowance by professionals;

6) Evaluating any compromises proposed by the Debtor-in-Possession;

7) Evaluating any proposed sales by the Debtor-in-Possession;

8) Evaluating the soundness of any attempt by the Debtor-in-Possession to assume or reject executory contracts;

9) Generally advising members of the Committee of the general progress or lack of same of the case and to take whatever steps are necessary to protect the interests of the constituents he or she represents.

On the other hand, counsel for the Official Committee of Unsecured Creditors is not a party litigant in any adversary proceeding, nor in any contested matters, i.e., objections to claims filed by the Debtor, or in any stay litigation. While counsel for the Committee is no doubt interested in these matters, the fact remains that it is not called upon to render any compensable services in connection with these matters.

Thus, it is appropriate to consider the specifics of the Fee Application filed by B & W, keeping in mind these general comments, which describes the services it rendered during the relevant period for which it seeks compensation as follows:

*Meetings and Consultations with the Committee*

■ According to the Fee Application, counsel met with the Committee twice and conducted what is described as a "telephonic meeting" five times. In this connection, it should be noted that counsel's firm had 352 telecommunications, 129 Federal Express transmittals and 198 telecopies sent to members of the Committee during the billing period. One must also keep in mind that there were 88 working days during the billing period. Thus, there is hardly any doubt that the Committee certainly received a minute by minute, blow-by-blow

instant communication from counsel. Of course, the Committee is more than welcome to pay for this super deluxe service, but there is hardly any justification to charge the estate of the Debtor for these types of services, certainly to the extent counsel is seeking compensation for same.

■ The next activity described in the Fee Application of B & W relates to the Second Amended Plan of Reorganization filed by the Debtor. There is no question that the involvement in the reorganization process by counsel for the Committee is not only proper, but it is one of the most, if not *the* most important, role counsel for the Committee should perform. Thus, these services rendered by counsel for the Committee in connection with this matter would ordinarily be compensable in full without any question.

However, in this particular instance, everyone was, or should have been, fully aware that to file any disclosure statement and plan of reorganization at the initial stage of this case was nothing more than a sheer exercise in futility. This is so because until the major problems of this Debtor—the two Government claims against the Debtor, one for $261 million by Urda and the other, $142 million (DLA), plus the CAE litigation which involves a claim in excess of $140 million, and the Seal litigation involving a claim by former retired employees of the Singer Company in the amount of $235,000.00—are resolved, and some other major claims asserted against the Debtor (Rauch–Kirklander–Plessy) in addition to some significant environmental problems in New Jersey and in California are resolved, no meaningful progress could be made toward reorganization. Thus, the fact that the Debtor so far filed three Disclosure Statements and three Plans—four, if one counts a Supplement—is really of no great event which would have required extensive evaluation and study requiring a great amount of time to study and analyze. B & W also seeks compensation for services rendered in conjunction with the leveraged buyout of the Debtor. This Court does not question the Committee's interest in the leveraged buy-

out, but is unable to comprehend what relevance, if any, this analysis has to the counsel's job, i.e., to promote and protect the interest of the Committee it represents.

■ Counsel also describes in great detail its involvement with agreements governing subsidiaries of the Debtor, none of which are subject to the jurisdiction of this Court. Counsel for the Committee indicates that the right to control the affairs of these non-debtor subsidiaries is, by some theory which is not very clear, a proper subject for consideration. Counsel for the Committee claims that because the Debtor resisted the proposition urged by counsel for the Committee, counsel for the Committee prepared an "appropriate Complaint" [sic], but because of an agreement governing subsidiaries, the Complaint was never filed. This Court is at a loss to understand the basis for the Complaint, unless the Committee considered to pierce the corporate veil and assert a claim against the non-debtor subsidiaries on an alter ego theory. The fact that non-debtor subsidiaries entered into an agreement is an interesting development; nevertheless, it is a matter of peripheral significance in the overall picture. In addition, in support of its Application, counsel for the Committee points out its contribution to the progress of this case. If there is progress in this case, it is certainly a very well-kept secret from this Court. One last comment. Counsel also seeks compensation for investigating the possibility of retaining investment advisors. First, it is not clear, and this Court seriously doubts that interviewing possible candidates for this position is a compensable legal service. Second, even assuming without admitting that time spent on this "legal service" is properly compensable, why on earth the Committee would want to hire investment advisors is not clear. To the extent that an investment advisor sought to be employed would be involved to assist in a sale of the Debtor's assets, this certainly could have been accomplished by the firm of KCI, a firm already retained in this case. To the extent an investment advisor would assist the Debtor to attract new investments, i.e., equity capital, a proposition at this stage of the history of this

Debtor is nothing more than an illusion totally devoid of any realistic basis.

Based on the foregoing, this Court is satisfied first that the hourly rate charged by partners is on the high side and certainly not comparable to local rates; second, the hours billed clearly exceed the time reasonably spent and the amount of award to B & W for the four-month period between March 1, 1990—June 30, 1990, shall not be more than $290,000.00. This amount, together with the previous allowance, represents so far an award of $541,-768.00 for a period of six and a half months in a Chapter 11 case which is far from reaching the point of confirmation.

This leaves for consideration the request by B & W for reimbursement of expenses. This Court set forth in detail its views considering the items of expenses which .are properly reimbursable in its previous Order on Motion for Clarification filed by B & W, and it would not serve any useful purpose to restate the points made.

█ Notwithstanding, certain additional comments should be in order. The current Application of B & W, in addition to expenses, seeks items discussed in the Order on Motion for Clarification, seeks reimbursement for "expenses of its legal staff" [sic]; "for nonlegal staff expenses" [sic]; "staff overtime"; and meal expenses for legal staff. One wonders why B & W did not seek reimbursement for expenses of the legal, and possibly the nonlegal, staff to go to work, for the cost of their laundry and drycleaning expenses, transportation, parking, coffee breaks, lunches, dinners, and finally, possibly occasional entertainment or the like in order to keep them satisfied and happy.

Based on the foregoing, B & W's reimbursement of expenses should be limited to $11,268.94.

### Application of Kahn Consulting, Inc.

KCI was retained at the request of the Official Creditors Committee. The Order of Retention was entered on February 7, 1990, and authorized the retention nunc pro tunc as of January 16, 1990. This Court previously awarded $294,874.00 fees and

$8,180.78 for expenses. The Application filed by KCI under consideration seeks an additional $193,224.25 as fees and reimbursement of expenses of $10,377.13. The period during which the compensation is sought is from May 1, 1990, up to and including July 31, 1990, or three months. This represents an award if granted of $64,408.00 per month. According to KCI it spent 907 hours rendering the services for which it seeks the award stated. The hourly charged rate ranges from $250 to $275 for directors and $50—$150 for consultants.

The bulk of the work was performed by two directors and one consultant of the firm. Taking an average of 22 working days per month, this would represent 66 working days during the relevant period. Considering an eight-hour workday, this would represent 528 hours. According to the Application, the two directors of KCI devoted 528 hours to the performance of its tasks in connection with this Chapter 11 case. The two directors, according to the Application, spent 107.25 and 446.5 hours, respectively, or a total of 553.75 hours. Of course, this in turn would have required them to work every workday of the week nonstop without a break 5 days for 8 hours each day. This does not even take into account the other time spent by consultants and other directors, all of which would add up to more than 160 additional hours, making a grand total of hours worked of 653 or about 300 hours less than stated in the Application.

█ The Application of KCI describes several hours spent dealing with matters which appear to be strictly legal and not within the competence and certainly not the work assigned to an accounting firm. For instance, some of the services relate to KCI's assistance furnished to counsel in regard to the Steel litigation, litigation which has never materialized so far; research by KCI of the False Claim Act in relation to the Urda claim; the DLA claim; and a review of all Fee Applications by professionals.

148

Based on the foregoing, this Court is satisfied not only that the hourly rate charged is on the high side, but also that the time spent is certainly in excess of the reasonable amount of time. Further, the hours spent on strictly legal matters are not compensable to an accounting firm. Accordingly, the reasonable amount of full compensation for KCI's services should not be more than $160,000.00.

The last remaining item for consideration is the request for reimbursement for expenses by KCI. As noted earlier, the amount is $10,377.13. It is this Court's opinion, based on previous rulings, that after the elimination of items considered to be overhead items, the total of reimbursable items should be limited to $7,999.48.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Application for Allowance of Interim Compensation and Reimbursement of Expenses of Oppenheimer Wolff & Donnelly, P.A., be, and the same is hereby, approved in part and disapproved in part, and a reasonable fee for services rendered during the relevant time period is $900,000.00, and compensation for costs is $109,077.93. It is further

ORDERED, ADJUDGED AND DECREED that the Application for Allowance of Interim Compensation and Reimbursement of Expenses of Stichter, Riedel, Blain & Prosser, P.A., be, and the same is hereby, approved in part and disapproved in part, and a reasonable fee for services rendered during the relevant time period is $490,370.00, and compensation for costs is $10,752.91. It is further

ORDERED, ADJUDGED AND DECREED that the Application for Allowance of Interim Compensation and Reimbursement of Expenses of Brown & Wood be, and the same is hereby, approved in part and disapproved in part, and a reasonable fee for services rendered during the relevant time period is $290,000.00, and compensation for costs is $11,268.94. It is further

ORDERED, ADJUDGED AND DECREED that the Application for Allowance of Interim Compensation and Reimburse-

ment of Expenses of Kahn Consulting, Inc., be, and the same is hereby, approved in part and disapproved in part, and a reasonable fee for services rendered during the relevant time period is $160,000.00, and compensation for costs is $7,999.48.

DONE AND ORDERED.