**In re William J. STOECKER, Debtor.**

Bankruptcy No. 89 B 02873.

United States Bankruptcy Court, N.D. Illinois, E.D.

March 18, 1991.

Thomas Raleigh, Raleigh & Helm, Chicago, Ill., trustee.

Robert Radasevich, Neal, Gerber & Eisenberg, Chicago, Ill., for the Trustee.

Michael P. O'Neil, Winston & Strawn, Chicago, Ill., for Connecticut Bank & Trust Co.

John D. Lien, Michael L. Weissman, Foley & Lardner, Chicago, Ill., for Beverly Bank.

James A. Cherney, Latham & Watkins, Chicago, Ill., for Citibank, N.A.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the first application of Thomas E. Raleigh (the "Trustee") pursuant to 11 U.S.C. §§ 326 and 331 and Federal Rule of Bankruptcy Procedure 2016 for allowance of interim compensation as Chapter 7 Trustee, in the voluntarily reduced amount of $400,-000.00 from the amount of $565,270.41 initially requested. Proper notice was given to all creditors and parties in interest pursuant to Federal Rule of Bankruptcy Procedure 2002. Responses containing objections were filed by Beverly Bank ("Beverly"), Citibank, N.A. ("Citibank") and The Connecticut Bank and Trust Company, N.A. ("CBT") Citibank withdrew its objections because of the voluntary reduction by the Trustee, but Beverly and CBT stand on their objections to allowance of the reduced request as excessive. Partial interim compensation in the amount of $164,588.00 was awarded without objection, pending completion of the briefing and presentation of the evidence. A full hearing on the application was held and the matter was subsequently taken under advisement.

The issue is whether in a large Chapter 7 case converted from Chapter 11, a trustee should be awarded under a first interim fee application, either the maximum compensation allowable under Section 326 of the Bankruptcy Code or approximately one percent less than the maximum, where the services performed have not been objected to as unnecessary, but the reasonableness of the amount requested is challenged. The Court holds under the facts and history peculiar to this case, that allowance of maximum compensation or amounts in that range should be deferred in a large asset Chapter 7 case until the conclusion of a successful liquidation when final maximum results and benefits are achieved, warranting such compensation. In a failed attempted reorganization case that is converted to Chapter 7, the maximum allowable compensation should not be expected or awarded on the initial interim application. Because the Trustee has continued to do a highly commendable job in a difficult and complex case, the Court allows a substantial portion of the requested compensation in the sum of $187,844.19.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this fee application pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. FACTS AND BACKGROUND

Some of the facts, background and history of this case are contained in earlier Opinions of the Court. See In re Stoecker, 118 B.R. 596 (Bankr.N.D.Ill.1990); In re Stoecker, 114 B.R. 965, 967–968 (Bankr.N.D.Ill.1990); In re Stoecker, 103 B.R. 182, 184–185 (Bankr.N.D.Ill.1989). Additional background information concerning the related corporate cases is contained in other Opinions of the Court. See In re Grabill Corp., 110 B.R. 356, 358 (Bankr.N.D.Ill. 1990); In re Grabill Corp., 103 B.R. 996, 997–998 (Bankr.N.D.Ill.1989).

An involuntary Chapter 11 petition was filed against the Debtor on February 21, 1989. On March 8, 1989, after a full evidentiary hearing, the Court ordered the appointment of a trustee. Shortly thereafter, on March 14, 1989, the Court entered an order for relief under Chapter 11. The following day, the Court entered an order requiring the Debtor to file a plan and disclosure statement by July 12, 1989. The U.S. Trustee appointed the Trustee on March 20, 1989.

After proper notice to all creditors and interested parties under Bankruptcy Rule 2002, an order of conversion was entered on February 26, 1990, pursuant to 11 U.S.C. § 1112(b)(1)–(4). The estate has been administered as an orderly liquidation

of the marshalled assets, concurrently with an intense investigation and review of the prior dealings of the Debtor. The Trustee received final compensation in the amount of $418,307.18 and expense reimbursement totaling $1,736.11 for his services as Chapter 11 Trustee. The U.S. Trustee appointed him interim Chapter 7 Trustee and he continues to so serve pursuant to 11 U.S.C. § 702(d).

## III. ARGUMENTS OF THE PARTIES

### A. *The Trustee's Position*

The Trustee asserts that he continued to marshal and sell substantial assets of the estate. The Trustee argues that he spent a great deal of time on the case during the period covered by the instant application, from February 26 to September 15, 1990. He claims that he devoted over 741 hours of time or seventy percent of his total time in the approximate six and one-half month period following conversion of the case and his continued appointment. Under a lodestar approach, at his current hourly rate for attorney's services of $190.00 per hour, his time would be normally billed out at only $140,885.00. His effective hourly rate under the original request would exceed $762.00 per hour and under the reduced request exceeds $539.00 per hour. As Trustee during the Chapter 7 phase of the case, exclusive of amounts turned over after conversion, which were liquidated during the Chapter 11 phase of the administration, he distributed to secured and administrative claimants the sum total of $18,708,-178.31, and has generated additional cash of $128,168.73.

Under the sliding scale established by section 326(a), the maximum allowable fee was the amount originally requested, namely $565,270.41. Although the Trustee concedes that the lodestar approach is a relevant factor for the Court to consider, he argues that it is only one of many factors to be weighed including: benefit to the estate from the liquidation of nine parcels of real estate and three non-debtor operating corporations; his oversight and administration of the remaining non-debtor operating corporations and attempts to market and sell same; intricacies of the problems encountered with regard to the settlement of certain contested matters and adversary proceedings; the ongoing prosecution of others; the novelty and difficulty of some of the issues involved therein; the amounts involved; and the opposition encountered. Despite obstructive conduct of the Debtor, the Trustee asserts that but for his efforts in spearheading the favorable settlement of his motion to consolidate the Debtor's estate with the related corporate estates (the "Grabill" cases) administered by that trustee, costs attendant to such litigation would have substantially depleted the estate to the detriment of any future dividends potentially payable to unsecured creditors. Moreover, because several of the executives employed by non-debtor corporations (whose stock are part of the Debtor's estate, and hence under the Trustee's control) receive substantial compensation plus bonuses for their work, and the Grabill trustee received compensation of approximately $1,000,000, the Trustee concludes that he should be awarded the reduced request of $400,000.00.

### B. *Citibank's Position*

Citibank objected to the Trustee's original request for the maximum amount allowable under section 326(a) as excessive, notwithstanding the excellent job done by the Trustee. Citibank apparently negotiated the voluntary reduction which is slightly more than two percent of the assets liquidated and disbursed. Citibank concludes that the reduced amount sought is consistent with the policy of the Bankruptcy Code to reward high caliber work and excellent results at a compensation level that significantly exceeds the straight lodestar approach.

### C. *CBT's Position*

CBT points out that most of the assets liquidated and distributed during this phase of the case administration have been to secured creditors. Furthermore, CBT notes that during the Chapter 11 phase of the case, the Trustee devoted nearly 2100 hours and all of his time to the case, in marked contrast to the instant application time period during which he expended

741.5 hours and only seventy percent of his time. Thus, the Trustee is seeking more money for less work during an approximately six-month period than he was awarded for the one year period during the Chapter 11 phase of the case. In addition, CBT argues that it is uncertain when unsecured creditors might receive any dividend, in light of pending litigation and ongoing administrative expenses. Hence, it is inequitable for the unsecured creditors to effectively bear the burden of the compensation requested. CBT concludes that a more appropriate interim compensation award at this time would be approximately one percent of the liquidated asset base or $187,-000.00, which is $46,000.00 more than a straight lodestar award. CBT notes that even a one and one-half percent compromise would yield approximately $280,000.00 or double the lodestar. CBT states that a one and one-half percent compromise was agreed to by the Grabill trustee, subject to a $1,000,000 cap, wherein a joint confirmed liquidating plan will yield a hundred percent payout for small unsecured creditors (less than $50,000.00) and a significant dividend for the large unsecured creditors. CBT parts company with both Citibank and the Trustee and asserts that the amount requested is the product of an overly inflated multiple lodestar approach.

### D. *Beverly's Position*

Beverly echoes most of CBT's arguments, but amplifies some points and makes others in arguing for an interim allowance of $164,588.00. This total was arrived at by using the Trustee's usual billing rate of $190.00 per hour for many of the services rendered, and higher rates of $250.00 and $600.00 per hour for other work. Beverly contends that much of the work was routine in nature and not deserving of any higher rate of compensation than normally charged by the Trustee. Consequently, Beverly's principal attack is on the effective hourly rate the compensation request will cost the unsecured creditors. Beverly also asserts that much of the groundwork and efforts made were performed during the Chapter 11 phase of the case, in which the Trustee was fully compensated. Furthermore, he was ably and expensively assisted by various authorized professional persons whose awarded compensation was principally based on the lodestar approach. Because most of the current period distributions have been made to secured creditors, Beverly argues that they should bear a more equitable share of the Trustee's fees pursuant to 11 U.S.C. § 506(c), rather than the unsecured creditors who are absorbing the brunt of the requested fees.

Beverly also questions some of the Trustee's accounting in the instant application, necessitating the additional pleadings submitted by the Trustee. Beverly expresses concern and disputes the benefit of the Trustee's actions relating to certain assets not yet liquidated. Beverly raises the possible decline in the value thereof during the Trustee's administration, and other possible claims not pursued and perhaps now lost to the estate. Beverly strongly claims that it is premature at this time to determine that the Trustee has done such an outstanding job to allow the compensation requested. Much of the potentially time-consuming and expensive litigation was settled with minimal efforts and time expended because the parties involved realized that the costs thereof would far outweigh the dividend distribution from the resultingly depleted estate. Even though settlement was reached on most of the matters, the Trustee takes too much credit for his efforts, and some of the matters settled "cribbed" earlier settlements made by Beverly and other creditors. Beverly and CBT hold a substantial portion of the filed unsecured claims. As such, they are impacted by the ongoing costs of administration and this fee request. Beverly argues that although the Bankruptcy Code is designed to award reasonable compensation to bankruptcy trustees commensurate with what they can earn for their services outside of bankruptcy, it is not intended to enrich trustees to the level of millionaires at the expense of unsecured creditors who have yet to receive any dividend.

### E. *The Trustee's Response to the Objections*

The Trustee responds that the objectors unduly emphasize the lodestar approach

and thereby essentially penalize him for economical and efficient case administration. Additionally, the Trustee claims he negotiated with undersecured creditors to pay the section 506(c) fees and commissions out of sale proceeds, which are asserted to total $91,726.00. As a result, of the $400,000.00 requested, only $308,274.00 would be in effect borne by the unsecured creditors. In response to the accounting questions raised by Beverly, the Trustee discovered one disbursement of over $452,000.00 was erroneously booked twice as having been paid. Pending litigation practically precludes an early partial dividend to unsecured creditors, so the Trustee argues, and his ongoing interim compensation requests should not be held hostage thereto. He contends that a significant dividend in the range of fifteen to thirty percent of allowed unsecured claims will be made in the near (but unspecified) future. He further points out that Citibank which holds approximately sixty percent of the filed unsecured claims supports the request. Accordingly, the Trustee concludes that allowance of $400,000.00 is both reasonable and necessary given the intangible benefits the estate has realized through his efforts.

### F. *The Trustee's Administration of Certain Assets*

Beverly has raised some substantial questions not quite rising to the level of objections concerning the Trustee's administration of certain estate assets involving Grabill Aerospace Corporation and stock in Park–Kenilworth Industries ("PKI"). According to Beverly's arguments, during earlier periods of the administration of the estate, the Trustee had prior offers to dispose of the estate's interest in PKI, which in turn owned Douglas Dynamics ("DDI"), for a substantially higher amount than the present asking price. Beverly further contends that the Trustee may have a conflict of interest in wearing not only his Trustee's hat for the benefit of the instant estate to maximize the value of the sale price of the PKI stock, but also because he is wearing the hat as a fiduciary for PKI which has a claim, via its subsidiary DDI, against the estate. Hence, Beverly contends that there may have been some mismanagement by the Trustee relating to the drop in value of the PKI stock, which may not be solely attributable to a market decline.

Furthermore, Beverly questions the Trustee's investment policies on obtaining maximum rates of return for invested liquidated assets. Beverly also notes that the Trustee originally allowed the applicable statute of limitations under Bankruptcy Rule 4005 to run without filing objections to the Debtor's discharge, but salvaged the cause of action by taking an assignment of a timely filed objection to discharge from the Grabill trustee. Beverly further contends that much of the purported benefit, albeit intangible and not quantified to the estate on the litigation settlements, was achieved with minimal efforts because as Beverly's counsel aptly put it: "no one will spend thousands on attorneys' fees just to get three to four cents on the dollar dividend out of the bankruptcy estate."

The Trustee responds that the problems with PKI and its subsidiary DDI are based on vagaries of their markets and in the industries, and other economic conditions beyond his control. The Trustee further contends that he did not assert a potential fraudulent conveyance action under Wisconsin law against certain parties holding the senior debt of PKI because under that law such cause of action is a creditor's action, which would allegedly be of no benefit to the shareholder of PKI (the Debtor's estate) and thus would have produced no recovery for the benefit of the estate's creditors. The Trustee further contends that he has made the best investments he could, given the timing of the numerous payments to secured and administrative claimants. In addition, by taking the assignment of the cause of action from the Grabill trustee, the objections to discharge were preserved and have ultimately been settled.

Because the only evidence taken at the hearing was that of the Trustee, and no additional evidence on these various points was introduced by Beverly, the Court can make no findings or determination on these matters at this time, but their presence and the unresolved status of the PKI and DDI

assets mandates that these matters be resolved at a further date.

## IV. STANDARDS AND AUTHORITIES

■ The principal controlling statutory authorities are 11 U.S.C. §§ 326(a), 330(a)(1) and (2) and 331 which provide as follows:

§ 326. Limitation on compensation of trustee.

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a).

§ 330. Compensation of officers.

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

> (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
>
> (2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1) and (2).

§ 331. Interim compensation.

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. § 331.

Interim fee awards are discretionary and are subject to reexamination and adjustment during the course of the case, and the Court may review the case at its conclusion and take into account the results obtained in making a final allowance. *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557 (Bankr. D.Utah 1985).

■ Pursuant to Sections 330 and 331 of the Bankruptcy Code, all professionals applying for fees must demonstrate that their services were actual, necessary and reasonable. Section 330 prescribes the statutory standards for allowance of compensation to all professional persons, in contrast to section 326, which caps the maximum amount of compensation that may be awarded to Chapter 7 and 11 trustees. Sections 330(a) and 326(a) are independent of one another. Substantial case authority providing judicial gloss and construction of the controlling statutory authorities was discussed in the Court's prior Opinion concerning the Trustee's final Chapter 11 compensation. *See In re Stoecker,* 118 B.R. 596, 601–605 (Bankr.N.D.Ill.1990). Those authorities are equally applicable with respect to this matter, are incorporated by reference herein, and need not be repeated.

Additional authorities cited by Beverly stand for the proposition that the Court should be conservative in awarding compensation to a Chapter 7 trustee because the amounts involved and the results obtained, cannot be determined until the conclusion of the case. *See In re Pennsylvania Tire & Rubber Co.,* 19 B.R. 124

(Bankr.N.D.Ohio 1980); *In re General Coffee Corp.*, 39 B.R. 7 (Bankr.S.D.Fla.1984). Both of those courts noted that interim awards under section 331 are intended to relieve professionals from "financing" protracted bankruptcy proceedings and should be used to prevent resulting hardship on the employed professional persons, pending final award, when all factors may be considered in their proper perspective. *General Coffee* in turn cites other decisions from the Fifth Circuit Court of Appeals rendered under the former Bankruptcy Act, holding that interim awards should be "well below any possible final allowance." *Id.* at 8. One secondary authority notes that it is appropriate to use a trustee's normal hourly billing rate applied to other commercial clients if the trustee is an attorney, in comparing the aggregate time charges against the statutory compensation base. *See* Bernstein & King, *Bankruptcy Compensation Guide,* ¶ 6.06[2] at 6–22 (1990).

## V. DISCUSSION

### A. *Applicability of the Johnson Factors*

■ Although the instant application involves the Trustee's interim fees subsequent to conversion, the methodology employed in the analysis is virtually identical to that contained in the Court's prior Opinion dealing with his final Chapter 11 fees. *See Stoecker*, 118 B.R. at 602–606. This is particularly applicable because from the beginning, this estate has been effectively administered as an orderly liquidation both pre- and post-conversion. All the various *Johnson* factors have been considered by the Court for purposes of this application.[1] As the Court has previously noted, allowance of fees under the current provisions of the Bankruptcy Code, Bankruptcy Rules and applicable judicial gloss, is an inherently subjective process for which resort to

the *Johnson* factors and other precedent is had in order to attempt to utilize objective yard sticks and guidelines. Some of the arguments made by the Trustee are predicated on a subjective premise that unquantifiable and substantial amounts of assets have been saved from consumption through awards of administrative expenses because the worst did not happen and litigation was avoided. This premise is so subjective that it makes it impossible for the Court to utilize same in any effort to objectively award fees for work that was actually done. Rather than focusing on a worst case scenario of what might have occurred, what is important is what did happen and what services were rendered by the Trustee.

Many of the *Johnson* factors are of little help. The fifth factor dealing with customary fees is singularly inappropriate. Each fee application must be independently evaluated and examined on its own merits, and there is no customary fee for a case of this nature. Similarly, the sixth factor is virtually of no importance because the fees are not fixed or contingent, but allowed only after notice and hearing. The twelfth factor is also of little assistance as awards in similar cases are not particularly helpful in evaluating the services rendered by the Trustee in this case.

One of the most significant of the *Johnson* factors is the first, dealing with the time and labor required. Because the lodestar method of compensation is involved, the 741.5 hours expended by the Trustee administering and liquidating the estate is extremely important. Of equal importance is the third factor relating to the Trustee's skill required to perform the services properly. Although Beverly has raised some questions regarding the apparent decrease in value of some of the estate assets, there has been no real challenge made that the

---

**1.** The twelve *Johnson* factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the

circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–719.

Trustee's skills were other than excellent. During the application period, the Trustee had to manage several operating corporations which were non-debtor entities by virtue of the Debtor's majority or complete share ownership of same. In addition, the Trustee was required to deal with numerous parcels of substantially improved and valuable real estate in four states, and other tangible personal property, much of which was liquidated, reduced to cash, and disbursed.

The second *Johnson* factor, the difficulty and novelty of the questions presented, is not as weighty as the Trustee would argue. There were no new or unanticipated difficult questions which emerged during this phase of the case. Notwithstanding the fact that the estate asset pool is complex and diverse, and presents management and logistical difficulties because of the size thereof, the Trustee had the benefit of able and experienced attorneys, accountants, investment bankers and other professional persons to assist him.

The Trustee also argues that the fourth *Johnson* factor should be given great weight, namely his preclusion from other employment due to acceptance of the appointment as Trustee. No showing was made by the Trustee during the course of his testimony, however, of what other business he lost or turned down while he attended to the ongoing administration of this case. The Trustee further argues on this point that he bore a substantial risk of losing his appointment from the U.S. Trustee if his motion to consolidate the estate with the Grabill cases had been allowed. What this argument ignores is that such consolidation did not occur, the motion was never tried, and it was apparently settled without any substantial formal discovery. Accordingly, the Trustee's perceived risk of loss of his appointment was only potential and was never put to the test of trial. Therefore, relatively little weight should be placed upon the fourth *Johnson* factor.

The seventh *Johnson* factor dealing with the time limitation imposed by the circumstances is of no significant consequence. The events surrounding the Debtor and the condition of the estate was essentially known. The estate spent over one year prior to the application period in Chapter 11 without being reorganized. During that year, the Trustee was understandably trying to see the forest for all the trees. That is not the case, however, for the application period which covers about six months after the first year into the case. The Trustee argues that the case has significantly dominated his life for approximately two years, and therefore the application should be weighed accordingly. The response to that argument is that the Trustee knew, or should have known that at the inception of the case, and his acceptance of his original appointment, and more so at the time he accepted the interim appointment as Chapter 7 Trustee, that the administration of this complex estate involved a very substantial, if not massive commitment of his time and efforts. He has been adequately compensated which is an acknowledgement of his good work, and he will be amply paid on this application for his continuing efforts to date.

A more significant *Johnson* factor is the eighth factor concerning the amount involved and the results obtained. According to the application, in excess of $18,000,000 was liquidated and turned over to secured and administrative claimants. As the Trustee has noted, apparently without any challenge, many of the assets that were sold were liquidated at or near their respective appraised values. Moreover, some of the cash recovered resulted from settlements of various bankruptcy causes of action in which counsel for the Trustee was intimately involved assisting the Trustee in effectuating results favorable to the estate.

Much weight has been placed on the settlement of the substantive consolidation motion without trial, producing effective partial subordination of some of the Grabill direct creditors to those claimants who are direct creditors of the Debtor's estate. As the Trustee's attorney put it: "they stayed on their side of the ocean, we stayed on ours." This still begs the question of how much of a dividend will be paid out of the estate to the unsecured creditors. That ultimate result is presently uncertain, not-

withstanding the Trustee's opinion that a substantial dividend will be paid. Any "guesstimate" of a dividend is not the proper basis to effectively impose upon the unsecured creditors such burden of the entire amount presently requested. Although in light of the settlement, potential dividends for unsecured creditors will not be further diluted by competing Grabill estate claimants, the extent of the actual dividends to the unsecured creditors is not known at this point in time. The Trustee is certainly entitled to his opinion that his work on the settlement of the substantive consolidation issue was worth $400,000.00 alone. That is only his opinion, however, and is hardly an objective one. It has not been objectively quantified from the submissions made to the Court.

The Court notes that although substantial sums have been recovered and dispersed, most of the funds went to holders of secured claims. The Trustee's post-hearing supplement to the application summarizes the section 506(c) recoveries obtained, and to be obtained from secured creditors. Pursuant to the Trustee's supplement, these creditors have agreed to reimburse the estate in excess of $91,-000.00. Thus, the balance of the Trustee's request, over $308,000.00, would be payable to the Trustee from funds which would otherwise be available for distribution to unsecured creditors. Query: if the unsecured creditors have yet to receive any dividends, and most of the $18,000,000 has been distributed to the secured creditors who have made the section 506(c) payments to the estate, are not the unsecured creditors, at this stage of the proceedings, being asked to bear an undue share of the Trustee's interim fee? The answer is "yes".

Another important *Johnson* factor is the ninth factor relating to the experience, reputation and ability of the Trustee. No party has disputed the Trustee's experience, reputation and demonstrated ability in this case. He has been a trustee for thirteen years, has administered numerous estates in this district, and is currently administering several other substantial and complex large asset cases. The importance and recognition of the Trustee's experience, reputation and ability, however, are principally reflected in his regular hourly billing rate of $190.00 per hour, not an insubstantial sum. As pointed out by Beverly and CBT most cogently in their objections, the compensation requested is in excess of $539.00 per hour. Consequently, the Trustee's application reflects a substantial multiple of his regular lodestar billing rate.

The tenth *Johnson* factor dealing with the undesirability of the case is of little import. This is perhaps one of the most desireable and challenging cases for a trustee to administer, given the extent of the assets involved and the efforts made during the Chapter 11 administration to organize the estate and liquidate same. Likewise, the eleventh *Johnson* factor is of no significant impact. The "client" of the Trustee is essentially the Debtor's estate with which the Trustee has had the benefit of an ongoing relationship as Chapter 11 Trustee for approximately one year prior to the instant application period.

## B. *The Parameters of the Compensation to be Awarded*

The parties have established appropriate parameters of compensation. The Trustee's request of $400,000.00 represents under a lodestar approach, a billing rate of $539.45 per hour, and is approximately 2.12 percent of the liquidated asset base of the estate disbursed during the application period. CBT has recommended that the Court take a balancing approach and award approximately one percent of the asset base or $187,000.00 which translates into approximately $253.00 an hour. CBT notes that if the Court were to award one and one-half percent of the liquidated asset base, that would produce an interim award of $282,489.00 or $381.00 per hour which is double the Trustee's regular hourly rate. The other end of the spectrum is Beverly's adjusted lodestar compensation of $164,-588.00 or an hourly rate of $221.90. In contrast, a straight lodestar approach, not recommended by any party, would produce compensation of $140,885.00.

In its final award to the Trustee for his Chapter 11 services, the Court determined that the best exercise of its equitable discretion would be to award the Trustee compensation in the sum of approximately two and one-half percent of the liquidated asset base. Moreover, earlier interim awards were allowed at the three percent maximum during the initial chaotic stages of the case after the order for relief was entered and the Trustee was initially appointed. Such interim awards during the initial Chapter 11 phase of the case were made without any creditor objecting to same, unlike the instant application. Those prior awards were made on an interim basis, reflecting the unknown state of affairs confronting the Trustee, coupled with the then greater complexity of the problems and time expended by the Trustee confronted with substantial lack of cooperation from many normal avenues and parties. Those conditions no longer exist. Therefore, the Court cannot, in the proper exercise of its equitable discretion, award the maximum compensation or any amount close to same at this time, notwithstanding the Trustee's excellent services and efforts. The Trustee principally bills on an hourly rate, hence, substantial weight must be given same, with some suitable adjustment to his lodestar rate to adequately afford him reasonable compensation, but not to the full extent requested.

All objectors including Beverly concede that some upward adjustment from straight lodestar compensation is both reasonable and necessary. The requested compensation effectively seeks a treble lodestar award and would, if allowed, be a windfall to the Trustee. Although his performance warrants something greater than a straight hourly lodestar formula, denial of the amount requested by the Trustee is not to be construed as any criticism by the Court of his work or efforts to date. No negative inference should be drawn by the Trustee from the Court's decision, but the Trustee seeks too much, too soon in this interim application. Compensation awarded herein is both reasonable and necessary at an effective lodestar rate plus one-third ($190.00 per hour + $63.33 per hour =

$253.33 per hour). This produces allowed compensation of $187,844.19 (741.50 hours × $253.33 per hour) which is approximately one percent of the liquidated assets disbursed over the application period.

The allowance is substantially higher than the effective lodestar rate awarded the Trustee for his Chapter 11 work of approximately $197.00 per hour. The higher award made here is in recognition of the more tangible and positive results achieved during this period. Although not as much as requested, this award is not paltry by any approach, but more fairly balances the competing interests of the various parties and more equitably shares the costs among the creditors who effectively pay ongoing administration expenses while following the spirit and letter of existing precedent. The result is fair, reasonable and generous, but not excessive, thus consonant with the stated congressional policy. The Court, considering all relevant facts, and pursuant to its equitable discretion, hereby awards the Trustee $187,844.19 on this interim application without prejudice for the Trustee to reapply in his final application.

## VI. CONCLUSION

For the foregoing reasons, the Court hereby awards the Trustee interim compensation in the sum of $187,844.19. The Trustee is authorized to disburse the sum of $23,256.19 as additional interim compensation under the instant application from the partial amount previously allowed without objection in the sum of $164,588.00.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.