**In re BANK OF NEW ENGLAND CORPORATION, Debtor.**

**No. 91–10126–WCH.**

United States Bankruptcy Court,
E.D. Massachusetts.

Dec. 9, 1991.

Terry Gibson, Asst. U.S. Trustee, Boston, Mass., for Dr. Ben Branch, Chapter 7 Trustee.

Deborah Griffin, Peabody & Brown, Boston, Mass., for FDIC.

Hugh M. Ray, Andrews & Kurth, Houston, Tex., and James Whitlock, Palmer & Dodge, Boston, Mass., for Dr. Ben Branch, Chapter 7 Trustee.

DECISION REGARDING THE INTERIM FEE APPLICATIONS OF ACCOUNTANT TO THE TRUSTEE, COUNSEL TO THE TRUSTEE, CHAPTER 7 TRUSTEE, INTERIM TRUSTEE, COUNSEL TO THE INTERIM TRUSTEE, ACCOUNTANT TO THE INTERIM TRUSTEE, AND SPECIAL COUNSEL TO THE TRUSTEE

WILLIAM C. HILLMAN, Bankruptcy Judge.

This matter is before the Court on applications for interim compensation pursuant to § 331 of the Bankruptcy Code. Both the United States Trustee and the Federal Deposit Insurance Corporation ("FDIC") filed objections to the applications.

## BACKGROUND

The debtor is a holding company for a variety of bank and non-bank subsidiaries as shown on Exhibit A. Regulators seized the bank subsidiaries on January 6, 1991. On the following day, the debtor filed the original petition herein for relief under Chapter 7 of the Bankruptcy Code. There followed the appointment of an interim trustee and his retention of counsel; the election of a trustee at the § 341 meeting; [1] the trustee's motions for the appointment of various counsel (all granted by this Court); and the commencement of a tug-of-war between the trustee and FDIC (in various capacities) involving hundreds of millions of dollars. The last continues, often conducted with attitudes which would cause Miss Manners much distress.[2]

## PRELIMINARY CONSIDERATIONS

Counsel filing applications for the allowance of fees and expenses in this Court carry a difficult burden. There is little precedent as to which expenditures of time, and which disbursements, are proper subjects for allowance. The few cases from this district and circuit discuss only fragmentary parts of the picture and are not always in agreement.

This decision relates to what is probably the first of many hearings on interim fee applications in this case. As a guide to the professionals involved, this opinion will first describe the basic rules which will be followed in dealing with this and any later applications. The Court's intention is to adopt these same guidelines as general principles in other and unrelated cases.

■ It should be noted at the outset that these rules may be subject to exceptions in clearly demonstrated special circumstances.

## FEE ALLOWANCES IN GENERAL

■ The standard for fee allowances in this circuit is the lodestar approach, *Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985), which expands upon the criteria of Bankruptcy Code § 330(a)(1). It requires the court to determine a reasonable hourly rate and apply it to the time reasonably expended, and then perhaps adjust by various factors. *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819 (D.Mass.1987).

This language represents a shift from prior bankruptcy law, which emphasized the policies of conservation of the estate and economy of administration. *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (Bankr. App. 1st Cir.1982). The effort now is "to balance a spirit of economy on the one hand with fees sufficiently close to market rates to attract qualified counsel on the other." *Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green*, 778 F.2d 890, 898 (1st Cir.1985); *In re WHET, Inc.*, 61 B.R. 709, 715 (Bankr.D. Mass.1986).

■ Even without regard to objections by other parties in interest, the court has an independent judicial responsibility to evaluate professionals' fees. *In re First Software Corp.*, 79 B.R. 108 (Bankr. D.Mass.1987). "The court ... is itself an expert on the question (of attorney's fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value." *In re WHET, Inc.*, 61 B.R. 709, 713 (Bankr. D.Mass.1986).

---

1. The chairman of the creditors' committee testified that the election was on the votes of the bondholders; that he had met the trustee in the course of a prior matter of this nature; and that he intended to select the trustee and the primary counsel ultimately retained. That counsel had also been involved in the prior proceedings. The trustee announced his intention to retain Andrews & Kurth at the time of his election.

2. In addition to the voluminous pleadings in this case, one could consult *The National Law Journal*, December 2, 1991, page 23. In an article describing the FDIC objections to these fee applications we find: "The bankruptcy trustee, Benjamin Branch, said the FDIC is trying to prevent him from suing for close to $700 million, in part by objecting to legal fees. 'They've got to be thinking that this is the easiest way to beat this situation and prevent the litigation,' he said."

## TRAVEL TIME

Some courts hold that travel time cannot be billed, although special exceptions may be made. *E.g., In re Grimes,* 115 B.R. 639 (Bankr.D.S.D.1990); *In re Carter,* 101 B.R. 170 (Bankr.D.S.D.1989); *Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333, 337 (E.D.Pa.1988); *In re S.T.N Enterprises,* 70 B.R. 823, 837 (Bankr.D.Vt.1987); *In re Seneca Oil Co.,* 65 B.R. 902, 909 (Bankr.W.D.Okla.1986); *In re Pacific Express, Inc.,* 56 B.R. 859 (Bankr.E.D.Cal. 1985); *In re Four Star Terminals, Inc.,* 42 B.R. 419 (Bankr.D.Alaska 1984).

Others allow for one half the attorney's hourly rate. *In re Environmental Waste Control,* 122 B.R. 341 (Bankr.N.D.Ind. 1990); *In re Ginji Corp.,* 117 B.R. 983 (Bankr.D.Nev.1990); *In re Hogg,* 103 B.R. 207 (Bankr.D.S.D.1988); *In re Pothoven,* 84 B.R. 579, 585 (Bankr.S.D.Iowa 1988); *In re Taylor,* 66 B.R. 390, 397 (Bankr.W.D.Pa. 1986).

Still others consider 75% of the attorney's hourly rate appropriate. *In re C & J Oil Co.,* 81 B.R. 398, 404 (Bankr.W.D.Va. 1987).

*In re Frontier Airlines, Inc.,* 74 B.R. 973, 977 (Bankr.D.Colo.1987) held that travel time was compensable because it was reasonable and necessary. *Accord In re Cano,* 122 B.R. 812 (Bankr.N.D.Ga.1991). *Approved, In re Microwave Products of America Inc.,* 102 B.R. 661 (Bankr. W.D.Tenn.1989).

The Court feels that "travel time" is a generic within which different species may be differently treated.

█ *Commuting time,* between an attorney's residence and primary place of business—the attorney's usual office—is charged to the business of life and not to the matters handled upon arrival.

*Travel from office to court* [3] may be just a few moments down the hill from Boston's financial district, or almost 1,800 air miles from Houston, as is the case in one application before the Court.

The Court is aware of the yardstick in § 330(a)(1)—that fees be based in part on the cost of comparable services outside of the bankruptcy arena. Nevertheless, a debtor or trustee under the Code must act reasonably. The debtor or trustee should act as would "a well-informed private client, paying his own fees." *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983).

That case dealt primarily with the reasonableness of hiring distant counsel at a higher fee than the local rate, a problem not present in these applications.[4] However, the case does point out that it is unreasonable to select non-local counsel "in an ordinary case requiring no specialized abilities not amply reflected among local lawyers." *Id. See also Palmigiano v. Garrahy,* 707 F.2d 636 (1st Cir.1983).

█ The Court may indulge a debtor, trustee, or committee desiring to retain professionals from outside of the district in a case which could be handled by local persons, but, generally speaking, it will not permit fees to be paid from the estate for travel time greater than those which would be incurred if the professional's office were within the district.[5] Following the practice of the Internal Revenue Service ("IRS") as regards travel expenses,[6] a professional travelling directly from home to court should deduct normal commuting time from the calculation of allowable travel time.

These restrictions are neither parochial nor protectionist; they serve to place reasonable limits on charges against estates. As indicated in the foregoing discussion, if the local pool of professional talent can

3. "Court," in this and related instances, includes the sites of other conferences, depositions, etc., not held at the office of the affected attorney.

4. Andrews & Kurth contends that their hourly rates are *lower* than Boston rates. If so, the difference is not significant.

5. This particular wording is intended to permit payment of travel time from points outside of the District when the time is within the range of within-District travel, *e.g.,* one can drive to Boston in less time from Portsmouth, New Hampshire or Providence, Rhode Island, than from Provincetown, Massachusetts.

6. *See* 26 C.F.R. § 1.162–2(e).

provide the necessary abilities to represent the interest requiring assistance, such persons should be retained. If the debtor/trustee/committee wishes to obtain the services of professionals beyond the limits of the district, they may be approved, but on the same terms as local professionals; the estate, being before this Court, cannot afford the luxury of importing professionals without a compelling reason therefor.

■ Applications for the employment of professionals not based within the District should explicitly specify where the operational personnel are based and what travel expenses are sought to be reimbursed.

The rule as applied to the professionals employed in the present case will be dealt with subsequently in connection with the discussion of individual fee requests.

■ As to "outbound" travel, where the case is pending in this Court, necessary travel time of local counsel attending proceedings outside of the District and the like will normally be allowed. The presence of local counsel in the forum may make the attendance unnecessary.

■ Travel time should be separately specified in the detail of activities required by Local Rule 34.

■ As to the rate of reimbursement, the Court adopts the position espoused by *In re Cano*, 122 B.R. 812, 814 (Bankr. N.D.Ga.1991):

Non-bankruptcy attorneys typically bill their travel time at the full hourly rate because it precludes them from engaging in other billable professional work. Because bankruptcy attorneys are no less entitled to compensation for opportunity costs, travel time should be considered as part of the total hours spent serving the client and should be reimbursed at the full hourly rate. Attorneys may not be as productive when travelling, but § 330(a)(1) does not demand that productivity be considered when awarding fees. Instead, as long as travel is necessary and the rate is reasonable, that provision is satisfied.

Of course, reasonableness is an important factor. If, for example, the trip is

unnecessary or the attorney would not have otherwise billed out the time, compensation is not called for. Similarly, if the method of travel is overly luxurious or if travel fees become too large a percentage of the total requested compensation, the travel compensation should be reduced. (citations omitted).

## SERVICES OF PARAPROFESSIONALS

■ The Court accepts that paraprofessionals performing limited professional tasks can result in considerable savings in costs and efficiency in operations of estates. For that reason, hourly rates for such persons may be separately stated and compensated, subject to the same limitations as the fees of professionals. *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 831 (D.Mass.1987). However, it should be noted that

if the service performed by a paraprofessional consists of typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying, or mailing documents, the task is clerical in nature and not compensable. Such tasks are traditionally charged to overhead and included in the professional's hourly rate.

*In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 492 (Bankr.D.Utah 1991). (citations and footnote omitted).

Great care should be taken to detail the nature of the services performed by paraprofessionals.

## SUMMER ASSOCIATES/INTERNS

■ This Court has previously held, but never in a written decision, that it will not permit the time of summer associates or interns, however described, to be charged to an estate. In the Court's pre-judicial experience, such employees do not provide enough value to the work performed by the firm to justify allowances.

## EXPENSES

Section § 330(a)(2) permits a professional to be reimbursed for actual, necessary expenses. In the first instance a determina-

tion must be made as to what is a necessary expense of the representation and what must be considered overhead and therefore part of the attorney's hourly rate.

Overhead is generally defined as

all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. The term is not definable with exact precision, but may be exemplified by such items as rent, taxes, insurance, lighting, heating, and other office expenses, including secretarial services.

*In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 584 (Bankr.D.Utah 1985). *See also In re Citizens Mortg. Invest. Trust,* 37 B.R. 813, 821 (Bankr.D.Mass.1984). Items of overhead will not be allowed.

### WORD PROCESSING

■ Due to the increased reliance on the word processor, some courts have allowed word processing as a separately allocable expense. *In re Jensen–Farley Pictures, Inc.,* 47 B.R. at 585. Others find that it is no different than other work done by support staff and accordingly, overhead. *In re Churchfield Management & Invest. Corp.,* 98 B.R. 838 (Bankr.N.D.Ill.1989); *In re D'Lites of America Inc.,* 92 B.R. 554 (Bankr.N.D.Ga.1988). The Court believes that the latter cases are correct and expenses for word processing will not be allowed absent most compelling and well documented circumstances.

### PHOTOCOPYING; BINDING

■ It is now generally accepted that expenses of photocopying are a chargeable expense of representation of an estate. The per page charge should be noted and should reflect the professional's actual costs. *In re CF & I Fabricators of Utah, Inc.,* 131 B.R. 474, 494 (Bankr.D.Utah 1991); *In re Ginji Corp.,* 117 B.R. 983, 995 (Bankr.D.Nev.1990).

Binding falls into the same category. *In re First Software Corp,* 79 B.R. 108 (Bankr.D.Mass.1987).

### OVERTIME; SUPPORT STAFF

■ This Court has recently held that secretarial overtime is overhead. *In re Murray,* 132 B.R. 808 (Bankr.D.Mass. 1991). Absent irresistible time pressures, the Court will echo what clients are alleged to have said: "Why couldn't *my* work have been done during the day, and someone else's on overtime?"

In *Murray* this Court also held that "charges for time spent by administrative office support personnel ... are not normally appropriate ... [and] must be covered by the hourly rates of the professionals." Separate charges for persons sorting files and the like are not allowable. *Accord, In re Holthoff,* 55 B.R. 36 (Bankr. E.D.Ark.1985).

### COMPUTER ASSISTED RESEARCH

■ There is a division of authority with regard to compensation for computer-assisted research. A majority of courts have found it to be a reimbursable expense. *Timberland Design Inc. v. Federal Deposit Ins. Corp.,* 745 F.Supp. 784, 790 (D.Mass. 1990), *aff'd sub nom. Timberland Design, Inc. v. First Service Bank for Sav.,* 932 F.2d 46 (1st Cir.1991); *In re Washington Mfg. Co.,* 101 B.R. 944 (Bankr.M.D.Tenn. 1989); *In re Prairie Cent. Ry. Co.,* 87 B.R. 952 (Bankr.N.D.Ill.1988); *In re UNR Industries,* 72 B.R. 796 (Bankr.N.D.Ill.1987); *In re Wildman,* 72 B.R. 700 (Bankr. N.D.Ill.1987); *In re Carter Enterprises,* 55 B.R. 548 (Bankr.C.D.Cal.1985).

The courts who have denied the expense have held it to be overhead. *In re Bicoastal Corp.,* 121 B.R. 653 (Bankr.M.D.Fla. 1990); *In re Florida Brethren Homes, Inc.,* 97 B.R. 652 (Bankr.S.D.Fla.1989); *In re Belknap, Inc.,* 103 B.R. 842 (Bankr. W.D.Ky.1989); *In re Pothoven,* 84 B.R. 579 (Bankr.S.D.Iowa 1988); *In re Cuisine Magazine, Inc.,* 61 B.R. 210 (Bankr. S.D.N.Y.1986); *In re Bible Deliverance Evangelistic Church,* 39 B.R. 768 (Bankr. E.D.Pa.1984).

This Court agrees with the language of *Timberland Design, supra:*

Lexis is an essential tool of the modern, efficient law office. As such, it saves lawyers' time by increasing the efficiency of legal research. Denial of reimbursement for Lexis charges in a proper case would be an open invitation to law firms to use high-priced attorney time to perform routine research tasks that can be accomplished quicker and more economically with Lexis.

*Timberland Design Inc. v. Federal Deposit Ins. Corp.*, 745 F.Supp. at 790.

This Court will allow for the reimbursement of computer assisted research.

The Court is aware of the potential for abuse of this rule by inexperienced data base users, who will read and/or copy the results of an over-broad search rather than refining it. These expenses will be closely monitored with regard to their cost effectiveness as used by each applicant for reimbursement.

## TRAVEL EXPENSES (LOCAL)

Just as a distinction has been drawn between commuting time, local travel time, and travel time from beyond the district, it is necessary to draw lines between the related expenses.

 No allowance is made for commuting time and no payment will be made for commuting expenses.

Going beyond that area, to expenses involved in within-the-District travel to court, some courts do not allow local mileage as an expense. *In re UNR Industries*, 72 B.R. 796 (Bankr.N.D.Ill.1987); *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr.D.Okla. 1986). Others allow local travel at the rate permitted by the Internal Revenue Code. *In re S.T.N. Enterprises Inc.*, 70 B.R. 823 (Bankr.D.Vt.1987); *In re C & J Oil Co. Inc.*, 81 B.R. 398, 404 (Bankr.W.D.Va.1987).

Some courts hold that local parking is not compensable. *See In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr. N.D.Ill.1989) and cases cited; *In re Pothoven*, 84 B.R. 579 (Bankr.S.D.Iowa 1988) (check); *In re Carter Enterprises*, 55 B.R. 548 (Bankr.C.D.Cal.1985). Others hold that

it will be reimbursed. *In re C & J Oil Co.*, 81 B.R. at 404.

There is also a split with regard to local cab fare. *Compare Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985) *and In re UNR Industries*, 72 B.R. 796 (Bankr.N.D.Ill.1987) *with Timberland Design Inc. v. Federal Deposit Ins. Corp.*, *supra, and In re Beck–Rumbaugh Associates, Inc.*, 68 B.R. 882 (Bankr.E.D.Pa.1987), *aff'd* 84 B.R. 369 (E.D.Pa.1987).

 This Court believes that expenses of travel from the professional's ordinary place of business within the district to this Court should be reimbursed. They are directly related to the particular matter rather than the general activities of the professional and would not have been incurred except for involvement in the case at hand. Applicants are cautioned, however, that a rule of reason must be applied to such expenses. Subway fares are always reasonable; taxi fares within the city generally so; hired cars or other transportation media may meet with an unfriendly reception from the Court unless specifically justified.

If a professional drives to Court, reasonable mileage (the current IRS allowance will be presumed reasonable), tolls, and parking fees are generally allowable.

## OUT OF TOWN TRAVEL

 When, under the principle given above, the Court will compensate professionals for travel time away from the District, the reasonable and necessary expenses of that travel will be reimbursed. *Boston and Maine Corp. v. Moore*, 776 F.2d 2 (1st. Cir.1985). Where the professionals retained are not local to this district the situation will require special attention.

## MEALS

 As is the case with other expenses, court holdings with regards to meals are not uniform. Certain courts allow for compensation for meals or meal time depending upon the circumstances. *In re Stoecker*, 114 B.R. 965 (Bankr.N.D.Ill.1990); *In re Frontier Airlines*, 74 B.R. 973 (Bankr.

D.Colo.1987); *In re Gulf Consol. Services, Inc.*, 91 B.R. 414 (Bankr.S.D.Tex.1988).

Others have held to the contrary. *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr.N.D.Ill.1989); *In re Pothoven*, 84 B.R. 579 (Bankr.S.D.Iowa 1988); *In re First Software Corp*, 79 B.R. 108 (Bankr. D.Mass.1987).

The Court adopts an general rule disapproving of charging meals, local or away, to a particular case. The cost of meals is normally an item of personal overhead.

### TELECOPYING (FACSIMILE)

■ The Court agrees with *In re CF & I Fabricators of Utah*, 131 B.R. 474, 494 (Bankr.D.Utah 1991): "Outgoing telecopies should be charged at the cost of long distance telephone rates, and incoming telecopies charged at the actual costs of paper, toner, or ink etc." This Court will not authorize payment of flat per page inbound or outbound telecopying rates. "Professionals cannot make a profit by billing in excess of actual charges for expenses to the estate." *Id.; In re Ginji Corp.*, 117 B.R. 983, 995 (Bankr.D.Nev.1990).

While a single page letter can be telecopied to many locations for less than the cost of postage, more extensive communications should be sent by the least expensive method unless truly time sensitive. Express mail and similar charges should be demonstrated to be required by orders of notice or other deadlines not capable of less expensive satisfaction. Intermediate mechanisms such as "second day air" and Priority Mail should be considered.

### PREPARATION OF APPLICATIONS FOR ALLOWANCES

■ Local Rule 34 requires extensive detail not normally provided to a client. Because of the effort required, professionals will generally be compensated for the time required to prepare the application at standard approved rates. *In re WHET, Inc.*, 61 B.R. 709, 712 (Bankr.D.Mass.1986).

### HOLDING BACK—REQUESTS FOR INTEREST

Some of the applicants in this matter have requested that this Court, to the extent that it does not allow the full amount of the interim requests, allow for a payment of interest on any amount held back. The applicants cite *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). In that civil rights case the court stated: .

Clearly, compensation received several years after the services are rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received ... as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates otherwise—is within the contemplation of the statute.

491 U.S. at 283, 109 S.Ct. at 2469.

The *Jenkins* principle appears to have been applied in bankruptcy. *In re Dodge*, 104 B.R. 491, 493 n. 1 (Bankr.S.D.Fla.1989). Another bankruptcy court allowed the payment of interest on awarded but unpaid fees. *In re D.W.G.K. Restaurants, Inc.*, 106 B.R. 194, 197–98 (Bankr.S.D.Cal.1989).

The trustee cites a recent Texas case where such interest was granted. *In re First Republic Corp.*, No. 388–34546–SAF–11 (Bankr.N.D.Texas 1991). But in that case the debtors took funds that were to be the interim fees and invested them at 8%. The court held that "based on the results obtained and the interest earned by the debtors on the deferred amounts, the court concludes ... that the fees should be enhanced to compensate counsel and the accountants for the delay in payments." *Id.*

■ There is indeed a common practice, when dealing with interim fees, of holding back the payment of a certain percentage until the ultimate final allowance of fees. *See In re Public Service Co. of N.H.*, 102 B.R. 276, 278 (Bankr.D.N.H.1989); *In re White Motor Credit Corp.*, 50 B.R. 885, 891 (Bankr.N.D.Ohio 1985); *In re Four Star Terminals, Inc.*, 42 B.R. 419 (Bankr.D.Alaska 1984); *In re New Eng-*

*land Carpet Co.*, 28 B.R. 766 (Bankr.D.Vt. 1983), *aff'd sub. nom. Gravel, Shea & Wright, Ltd. v. New England Carpet Co*, 38 B.R. 703 (D.Vt.1983), *aff'd* 744 F.2d 16 (2d Cir.1984); *In re Coconut Grove Bayshore, Inc.*, 33 B.R. 194, 195 (Bankr. S.D.Fla.1983); *contra In re Kaiser Steel Corp.*, 74 B.R. 885 (Bankr.D.Colo.1987). The average holdback appears to be twenty-five percent. *In re Public Service Co. of N.H., supra.*

Fee claimants in this case appear to be taking the position that, since the trustee holds more than enough cash to pay all fee and expense requests in full, failure to do so results in a necessary right to interest on the unpaid balance.

█ The Court finds the notion of interest on interim fees to be unacceptable. Professionals apply for interim compensation based on the work that they have performed. The court then makes a determination as to reasonable compensation for actual and necessary services and expenses. The hold back is because the Court is unable to make a sufficient determination on those criteria until a later stage of the proceedings. Congress enacted § 331 to permit interim fees so that professionals would not have to wait years for compensation. The Court will not apply the standards used in civil rights cases to chapter 7 or 11 proceedings. *Accord, In re Seneca Oil Co.*, 65 B.R. 902 (Bankr. W.D.Okla.1986).

### THE INDIVIDUAL FEE APPLICATIONS

*BDO Seidman*

BDO Seidman ("BDO") requests fees and expenses as accountant to the Trustee in the amount of $123,808.30 and $3,214.90 respectively. The Court allowed the application for employment on July 23, 1991.

The application clearly indicates that while the two leaders of the "service team" to be organized to undertake the assignment were based in Massachusetts, other team members were located in New York, Richmond, Chicago and Grand Rapids. Because the Court's rule on retention of non-

local professionals was not clearly articulated previously, it will consider this revelation adequate to justify the use of "foreign" personnel by BDO in this case.

█ FDIC objects to the payment of an interim fee as premature, primarily because much of the service rendered relates to "assets not yet liquidated or claims not yet asserted or still unresolved."

To sustain this objection would be to nullify much of what § 331 was intended to accomplish. If there are to be interim fees, they will often involve matters not yet brought to fruition. And how will these matters ever be resolved unless professionals study them? The objection is not well taken. Some minor adjustments are, nevertheless, in order.

█ In reviewing the items relating to compensation for services, the Court finds several entries for J. Grana who performed 50.5 hours of data processing. This involved preparing Lotus spread sheet analysis. Additionally there are entries for J. Bisset, who performed such tasks as typing reports for a total of 22.5 hours. Their rates are respectively $40.00 and $25.20 for a total of $2,587.00. To repeat language quoted earlier, "If the service performed by a paraprofessional consists of typing data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying, or mailing documents, the task is charged to overhead." *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 492 (Bankr.D.Utah 1991). As these services are part of the overhead, the amount listed is not allowed. A further seemingly distinct item of $289.50 representing 11.5 hours of "administrative time in preparation of reports and correspondence" is similarly not allowed.

█ There is a description of the work performed by two consulting Senior Managers who bill at $200.00 per hour. On August 13, 1991, they each bill 8 hours for "meeting with trustee and travel". They offer no breakdown in the time and no explanation about the reason for the meeting or the travel and why two individuals were required. The failure to breakdown

the time spent on each activity violates Local Rule 34(A)(1)(c). Additionally, without an explanation of what exactly they did leaves the Court unable to determine whether the services were necessary. A permissible entry would have allocated the time spent on the meeting, the time spent on the travel, and a short explanation of why it was necessary for both to attend. The time for one of the attendees will be allowed; $1,600.00 will be deducted from the compensation sought for the other.

The immediately preceding paragraph should not be regarded as a flat rule that two persons from the same employed professional organization cannot attend the same event; it simply requires that the necessity for such "double teaming" be explained.

■ Mr. Cox would have the estate pay $188.28 for a lunch at Maison Robert, a restaurant described in *Boston* magazine as "$$$," meaning "Expensive." There is no explanation of the choice of locus. Lunch at Maison Robert without any explanation whatsoever is not an allowable expense, even if this meal were reimbursable.

The second entry on the expense sheet is for Pamela Packard in the amount of $2,074.09. Apparently, Ms. Packard, tax senior manager in New York (named in the original application at that location), travelled from New York and incurred local living expenses. In a two week period she travelled to Boston three times at a cost of approximately $300.00 each time. Her hotel each night was approximately $140.00. She charged local travel and meals.

Her time records substantiate that the trips to Boston were not junkets. However, her modest meal expense, totalling $220.11 for eight days, must be disallowed.

■ The third expense is $158.69 for "miscellaneous—local office". There is no further explanation. Since the Court is unable to determine whether this was for computer-assisted research or pizza, no consideration can be given to whether it is permissible or necessary. It is therefore, denied.

The Court believes that the services rendered by BDO have been valuable to the estate notwithstanding that the projects undertaken are not complete. There is no reason for a hold-back of any portion of the allowed fees and expenses.

BDO is awarded an interim fee of $119,331.80 and expenses of $2,647.82 in full payment for the services rendered as described in its First Interim Application for Allowance.

*Andrews & Kurth*

On April 2, 1991 the Court authorized the employment of Andrews & Kurth ("A & K") as counsel to the trustee effective March 13, 1991. This interim application "seeks compensation for actual and necessary professional services in the amount of $1,164,041.45, and for travel time at 50% of regular hourly rates in the amount of $46,539.50 and reimbursement of actual and necessary expenses incurred by A & K in the amount of $164,909.96 ($82,154.52 of which are travel expenses) from March 13, 1991 until August 31, 1991."

Before beginning its analysis the Court should emphasize that it finds the services provided by A & K to the chapter 7 trustee to be of extremely high quality. The remarks which follow should not be taken as reflecting adversely upon the firm's ability; they address merely the narrow issues involved in a fee application.

■ As an initial matter, the Court would remind A & K that it is an abuse of court time to require it to read, and of estate expenses to require it to pay for the reproduction of, the multiple paragraphs which recite the excellent results which it and the trustee have obtained (it is inferred that they were solely responsible) in other matters; they have already been retained. Such discussion goes far beyond anything which might be needed to comply with the *Johnson* factors.[7] If indeed, "as a firm primarily based in Texas applying for fees in New England, A & K consciously sought to avoid braggadocio," *A & K Response to FDIC*, § 4, n. 2, it has failed in that at-

---

**7.** *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

tempt. Perhaps New England professionals are just more conservative in their advertising.

The Court finds it curious (as does FDIC, but they may be prejudiced, if A & K's allegations are correct) that A & K seems to claim credit for an increase in market value of the debtor's securities. If this is in fact A & K's doing, their efforts better belong in another arena where they will be far more handsomely compensated than under the rules of this Court. There is considerable puffery in the A & K application, and the Court, frankly, is not amused, flattered, or impressed. According to the application "this is one of the largest, if not the largest, Chapter 7 cases pending in the United States;" "a 'national' case involving significant problems and issues of public policy impacting the banking crisis and the ability of financial institutions to raise and repay private capital sources," *Application*, § 10. It is "huge, unique and complex," *Id.*, § 16. All of this may be true, but it is irrelevant to the issues before the Court as it considers an interim fee application.

The purpose of an application for interim allowances is to inform the Court of the facts upon which it will base its decision. There is no jury finding facts in the Bankruptcy Court. If the finder of facts is to become inflamed it will be because of the impressive performance of the professionals who serve in this matter and not what has been or will be done in other cases or (except perhaps to a very minor extent) the significance of the cause in the ultimate scheme of things.

FDIC has filed an extensive objection to A & K's application in which the United States Trustee has joined, to which A & K has countered with responses to the United States Trustee and the FDIC and a posthearing brief. The various objections which the Court feels merit discussion, A & K's counters thereto, and the Court's findings follow.

1. FDIC alleges a failure to comply with Local Rule 34(D) because, "although the narratives name the professionals involved in each task and state the numbers of hours worked by each professional, no such identification of the work done by each professional has been included in the narrative." *FDIC Objection* § A1. The objection may be technically correct, but the Court feels that the mode of presentation is adequate to inform it of activities which form the basis of the fee request in each described task. There is no intimation that the hours claimed are inaccurate.

2. Three law firms have been retained by the trustee by authorization of the court. A & K's application, says FDIC, does not contain the certification required by Local Rule 34(B) that no compensation is sought for duplicative services. *FDIC Objection* § A2. A & K replies, to the similar complaint of the United States Trustee:

> The [chapter 7] Trustee monitors on a daily basis the work of each law firm involved in this case. Dr. Branch assigns specific tasks to each firm, and often to specific lawyers within each firm. The mere presence of three law firms is no more probative of duplication than multiple lawyers within the same firm. A & K respectfully submits that it has provided sufficient information regarding duplication of effort."

*A & K Response to U.S. Trustee's Objection* § 1.

FDIC is correct; the required certification is not present in the application nor in the response to the United States Attorney. The lapse is corrected in the response to FDIC's objection. *A & K Response to FDIC Objection* § 2. Nevertheless, from the Court's examination of the several fee applications, there has been duplication. A & K's response to the United States Trustee is disingenuous, and the testimony of the chapter 7 trustee at the hearing on fee applications is no less flawed. The certification in the response to the FDIC is technically incorrect.

The Court is mindful that it has authorized the retention of three law firms with different, but inevitably overlapping, functions. Coordination between law firms is somewhat more difficult than coordination between departments of a major law firm

(in most instances) and there is, unfortunately, a potential for duplication of effort, and what may be regarded as time wasted in coordination. "The utilization of more than one law firm almost without question involves some duplication.... a subjective evaluation must be made by the Court and the creditors to minimize excessive burdens being placed on the estate." *In re Frontier Airlines, Inc.*, 74 B.R. 973, 977 (Bankr. D.Colo.1987).

While there has been duplication of effort, and the Court cautions the trustee to pay more attention to substance than to form in his supervision of counsel, the Court finds that no deduction is required *from the present application.* Perhaps the problem could have been reduced by relying upon a single law firm for all services in the case, but that is water over the dam.

3. FDIC urges that services rendered to each subsidiary of the debtor be considered independently for purposes of A & K compensation. *FDIC Objection* § B7. This is not reasonable in the circumstances of the case. As the trustee's testimony evidenced and Exhibit A demonstrates, the debtor had a coat with many pockets. It withdrew from and inserted into the various pockets as needed and as required by circumstances, such as regulatory demands and other business factors. When the regulators seized some of the larger pockets, it became necessary to sort out what belonged in those pockets and what was appropriately elsewhere. While there has not been a substantive consolidation of the various subsidiaries of the debtor, it seems that there was to a major extent a practical consolidation long before proceedings in this court were on the horizon. Of course the Court will not permit scarce resources to be allocated to empty shell subsidiaries, but it finds little evidence of such endeavors. Looking in the pocket to see if it has any contents is certainly an appropriate venture for a trustee and his counsel and other professionals.

4. FDIC challenges the fees of Edward Savage, a New York based partner in A & K, in connection with the sale of Bank of New England Trust, N.A. (Florida). Especially mentioned is 120 hours spent drafting a purchase and sale agreement for the bank at Savage's rate of $300 per hour, work which FDIC says could have been handled largely by a more junior attorney. FDIC also points out that Mr. Savage's fees total 41% of the hours but 53% of the fees allocated to sale and operations of operating subsidiaries. *FDIC Objection* § B8. A & K responds, snidely, that

had a junior attorney drafted the documentation, supervision by Mr. Savage would have been necessitated and would have surely subjected A & K to an attack by the FDIC of duplication of efforts.

*A & K Response to FDIC Objection* § 8–9.

The Court is not amused by this type of legal argument. A & K and, to a lesser extent, FDIC counsel, are cautioned to behave themselves and respond to pleadings respectfully, whether they mean it or not.[8]

Of more importance to the present determination is the further statement by A & K that it had, prior to the filing of the objection, "notified the Trustee that the firm had decided upon a voluntary reduction of the fees of Mr. Savage." *Id.* Alas, that knowledge was not brought to the attention of the Court in any direct way, and the Court has attempted to review all 7.25 pounds of relevant pleadings filed by A & K in connection with the current application for allowances.

Since A & K seems to agree that some overcharge is involved in the $185,205.00 for 617.05 hours of work by Mr. Savage at $300.00 per hour, and absent guidance otherwise, the Court will reduce the time rate of Mr. Savage to $250.00 per hour—the same as that of Mr. Ray, lead bankruptcy

---

8. "From his bench in Maine, Judge Carl Bradford sees incivility and hostility from attorneys of all stripes—a cancer of nastiness spreading through the profession's soul.... 'There's nothing wrong with strong advocacy in the cause of your client,' he says, 'but it has to be done with respect for your brother or sister counsel, and respect for the dignity and integrity of the court.' " J. Jefferson, *But What Role for the Soul?,* 77 A.B.A.J. 60, 63 (Dec. 1991).

counsel for the firm—and deduct $30,-852.50 from the requested fee.

5. FDIC then challenges on two grounds the $159,762.00 which A & K seeks for work on pension issues. First, that Palmer & Dodge ("P & D"), whose fee application will be addressed subsequently, is also billing for work on pension issues. Second, that the pension matters are as yet unresolved.

This argument is part of a broader position by FDIC—that interim compensation is inappropriate until the particular issue is finally resolved, and that, should the trustee not prevail, "counsel's efforts would have been in vain and not appropriately compensable from the estate." *FDIC Objection* § 10. The Court disagrees with both ends of this proposition.

This is a complex case. It will require substantial efforts of counsel to determine which issues should be pursued and which are without merit. The question of entitlement to the pension fund overfunding, for example, represented to be many millions of dollars, is not one which can be decided quickly. The chapter 7 trustee is entitled to pay his counsel to advise him. If counsel should advise the trustee that the claim is without merit and should be dropped, or if the advice is that it should be pursued, counsel has performed its assigned task and should be compensated. If, at the end of the case, the advice should be demonstrated to be so faulty that, for example, a motion for summary judgment was granted against the trustee or (even worse) counsel was sanctioned for bringing a frivolous complaint, the final fee would be adjusted to reflect that fact. If, on the other hand, the claim results in vast sums flowing into the estate, it would not be inappropriate for counsel to seek something in excess of its normal rates. Whether such a bonus would be paid is presently hypothetical. "The First Circuit has decided that upward adjustments for quality of representation 'are to be few and far between.' ... Finally, the 'results obtained' factor generally will be subsumed within the other factors used to calculate a reasonable fee." *M. Berenson Co. v. Faneuil Hall Market-*

*place, Inc.,* 671 F.Supp. 819, 832 (D.Mass. 1987). (citations omitted).

FDIC would have counsel undertake these matters on a contingent fee basis. Suffice it to say that such a method of compensation is not appropriate in this case, at least as to the issues where FDIC has made its argument.

This portion of the fee request, it could be argued, would be an appropriate subject for a hold back. If we were further into the case such action might be appropriate. At this point, the Court anticipates that there will be sufficient opportunities for adjustment in the future when all of the parties have a better grasp of the situation. It does not, however, agree with A & K that "results obtained are irrelevant except in rare or exceptional cases." *A & K Response to FDIC Objection* § 11.

6. FDIC invites the Court to review a number of pleading devices and tactics utilized by A & K and P & D with regard to the so-called "transferred funds." *FDIC Objection* § 11. The fee amounts involved are $58,000 for A & K and $34,525 for P & D.

■ While the Court might not have taken the same approach as did counsel for the trustee had it been his chief litigation counsel, it cannot say that the techniques used were so lacking in merit as to require a reduction in fees.

7. All three firms retained by the trustee have billed for services with regard to tax matters, to wit:

| | |
|---|---|
| A & K | $187,888.00 |
| P & D | 235,821.00 |
| Shea & Gardner | 36,936.00 |
| | $460,645.00 |

This seems to contradict the most positive testimony of the chapter 7 trustee that he carefully delegates what must be done to specific firms and even to attorneys within the firms. FDIC appears to be correct when it says that "no attempt has been made by any of the law firms to explain any division of labor or other mechanism for avoiding duplication of effort. *FDIC Objection* § 12.

The FDIC and United States Trustee both express concern about the possible duplicitous efforts on the part of the three law firms of the trustee. The Court is certainly concerned about this additional expense to the estate and, if found appropriate, will adjust fees. *See, e.g., In re Sapolin Paints Inc.*, 38 B.R. 807 (Bankr. E.D.N.Y.1984); *In re Bicoastal Corp.*, 122 B.R. 140 (Bankr.M.D.Fla.1990).

The Court has carefully reviewed the reports of activities of the three firms involved and finds a reasonable allocation of effort. It must be remembered that P & D was sole counsel for the interim trustee until the creditors elected Mr. Branch (and with him in tandem, A & K). Its "front end" activities were extensive and varied.

All of the challenged activities fall under the general heading of "tax," but the grouping is actually a conglomeration of various activities involving a variety of taxes. While the level of hyperbole in A & K's application is high, the Court finds that the services rendered by A & K were not excessive, if not as impressive as they would have the reader believe.

8. The Court must next address the question of A & K travel time.

In the general considerations which preface this opinion, the Court held that professionals outside of the District might be compensated for "external" travel time and expenses only if they provided a type of services not available on the local market; otherwise they would receive the same allowances for travel as would professionals based in the District. Approved travel time is to be compensated at the professional's full billing rate.

It has also been noted that these standards were not clearly articulated at the time that A & K assumed its engagement as counsel to the chapter 7 trustee. As a result, the Court is reluctant to enforce them most strictly against A & K. It could be argued that the geographic data in the application to retain A & K was sufficient to put the Court on notice that travel from Texas would be the rule, and the Court will give the benefit of the doubt to A & K.

Travel expenses will be allowed as requested.

Perhaps unknowingly, A & K has provided the Court with an equitable solution to the problem of travel time. The Court will allow A & K its requested 50% of standard rates for travel time, less the correction of $1,712.50 mentioned in A & K's response to the FDIC.

The Court accepts A & K's explanation of the various inconsistencies pointed out by FDIC and the United States Trustee not otherwise dealt with.

Turning to the expense side of the application, the Court will credit A & K with $70.10. Their total claimed of $164,909.66 is short by that amount. The problem is primarily an error in adding the expenses for June, 1991.

The Court disallows claimed expenses of delivery in the amount of $7,261.85 as not substantiated. Not everything is an emergency. Compare that figure with the total of $434.21 charged for postage for the same period. The disallowance is in accordance with the principles stated at the beginning of this decision.

Telecopy expense of $15,431.90 (at $2.00 per page, *A & K Response to United States Trustee*, p. 3) is not allowed for the reasons set forth in the introductory portions of this opinion.

An unsubstantiated item for "Supplies" in the amount of $34.91 is not allowed.

The Court will allow the claimed "research" expense in the belief that it is computer-assisted research. A & K will surely inform the Court if it is otherwise.

Not allowed is secretarial overtime/word processing in the amount of $8,842.09 (not $8,600.00 as stated in *A & K Response to FDIC* § 18).

In line with the principle announced earlier in this decision, the sum of $4,788.00, representing 79.80 hours of summer associate time at $60.00 per hour will be deducted.

Based upon these adjustments, A & K is awarded interim compensation in the amount of $1,133,188.85; reimbursement for travel time in the amount of $44,827.00;

and reimbursement of expenses in the amount of $128,620.91. This is in full for the services and expenses detailed in its application.

*Interim Trustee*

■ John Whitlock was appointed interim trustee on January 10, 1991 and seeks compensation from that time until March 21, 1991. The United States Trustee objects.

At the time of the election, he turned over $957,191.58 to the chapter 7 trustee.

While the interim trustee, in his well documented report and application, demonstrates that he expended 214.8 hours in the performance of his services, and at his standard billing rate of $250 per hour would be entitled to $53,700, he appreciates that the compensation of a trustee is limited by the provisions of § 326(a) of the Bankruptcy Code. Computing the statutory cap upon the sum turned over to the chapter 7 trustee, if that is the operative figure, would result in a fee of $28,715.74. The interim trustee asks for that amount now, as against a final fee to be determined in the future.

The total compensation of both the interim and elected trustees "may not exceed the maximum compensation prescribed for a single trustee." 11 U.S.C. § 326(c). As a result, any compensation awarded to the interim trustee will affect the amount awarded to the elected trustee.

Since the amount upon which compensation is to be computed is not a firm figure at either end—we neither know how much cash the interim trustee had when he opened his books nor the precise total of funds "to be disbursed"—this *is* an appropriate place for a discounted computation.

The interim trustee is awarded an interim fee of $14,357.87, being 50% of $28,715.74, as against any compensation ultimately awarded.

The interim trustee's suggestion that, under some circumstances, he could be awarded more than the maximum fee set in § 326(a) is opposed by the United States Trustee and FDIC and is contrary to the law. *See In re Garland Corp.*, 8 B.R. 826 (Bankr.D.Mass.1981); *In re Barker*, 132 B.R. 32 (Bankr.N.D.Cal.1991). Demonstration of services rendered and application of the lodestar principle as to trustee's fees must be within the statutory maximum.

*Chapter 7 Trustee*

■ The chapter 7 trustee was elected on March 21, 1991. His first interim fee application states that he has devoted 1,046 hours to working on the estate and 86 hours of travel time. At a requested rate of $300.00 per hour for work and $150.00 for travel time he would be entitled to $326,677.50. He seeks compensation in the amount of $183,776.88 with relation to the period of March 21, 1991 until August 31, 1991 as an advance on his final fee. The final fee would, as noted above, be subject to the constraints of § 326(a). At the hearing, he offered testimony as to the amount that he expects the estate will receive and therefore that he will be eventually entitled to the amounts requested. *See In re Commercial Consortium of California*, 135 B.R. 120 (Bankr.C.D.Cal.1991). The Court finds that an award of interim fees is clearly contemplated by the Code and as such, will be allowed. *In re Stoecker*, 125 B.R. 767 (Bankr.N.D.Ill.1991). The question, however, is in what amount. *Id.*

As has been noted, the statute measures the trustee's compensation against "all moneys disbursed or turned over in the case by the trustee to parties in interest." 11 U.S.C. § 326(a). The hours invested in the case by the trustee, his hourly rate, and the other loadstar factors, are deemed not controlling in determination of an interim fee to be paid. This opinion should in no way be construed as an approval of any aspect of the trustee's presentation in that regard, including the reasonableness and necessity of time and expenses and the hourly rate claimed.

The evidence introduced at hearing was that the debtor has approximately $10,368,000.00 on hand. Much greater sums are expected in the near future. The Court acknowledges the correctness of the United States Trustee's observation that trustee compensation is measured against funds

paid out rather than funds received. However, in computing an interim fee request, it is reasonable to assume that the bulk of the funds received *in the circumstances of this case* will ultimately be disbursed to parties in interest. To guard against any error in that assumption, a large "discount" is appropriate in allowing interim compensation. Further, the Court is giving no consideration to the amount of funds which may have been in fact disbursed by the trustee; that is a matter of controversy between the chapter 7 trustee and the United States Trustee. *See Chapter 7 Trustee's Application* § 14; *Objection of United States Trustee* § 5.

Quantifying an interim fee for a trustee is a difficult enough task without adding any further levels of uncertainty. The Court will award the chapter 7 trustee an interim fee based upon the sums on hand, and not his estimates of cash which will be available at some future date.

Applying the 3% cap to $10,368,000 gives a tentative figure of $311,040.00, which coincidentally happens to be very close to the trustee's proposed hourly earnings.

Based upon the above calculation, the Court will award the chapter 7 trustee an interim fee of $155,520.00, which is based upon a 50% discount from the tentative maximum. FDIC's figure is $151,406.37, although the method of computation is quite different.

*Objection of FDIC* § 2.

The trustee lastly requested that this Court award interest on any fees held back. As noted above, the Court does not agree that such a payment is appropriate.

*Palmer & Dodge*

On January 11, 1991, the Court approved of the employment of Palmer & Dodge ("P & D") as counsel to the interim trustee *nunc pro tunc* to January 10, 1991. On April 2, 1991, the Court allowed the employment of P & D as local counsel to the chapter 7 trustee.

P & D seeks $1,045,143.50 for services and $58,708.01 for expenses for the period from appointment through September 30, 1991.

FDIC has filed an objection to the application which is generally seconded by the United States Trustee. Most of the objections parallel those made to the A & K fee application.

A close review of the hourly detail provided makes clear that there was some overlapping of effort with A & K and other professionals. While, once again, the trustee is cautioned to increase his efforts at eliminating duplication, there is not an appreciable amount. The chart prepared by FDIC, *FDIC Objection*, Ex. A, is correct but ignores the time when services were performed. The point is well made by P & D that the bulk of its hours were expended in the earliest period of the case. *P & D Amended and Restated First Supplement to Application* ("P & D Supplement" hereafter), Ex. A.

Typical of the sniping that runs throughout the pleadings is FDIC's remark that P & D should not be penalized for the learning curve of its successors "unless they failed to transmit the fruit of their work." *FDIC Objection*, p. 3. The only suggestion that such might be the case is contained in this single sentence. The hint is improper.[9]

Review of expense entries discloses certain conflicts with the principles announced earlier.[10]

P & D charges for document preparation, which is explained as "for overtime secretarial assistance." *P & D Supplement* § 1c. The $3,379.93 item is disallowed. "This practice epitomizes the unacceptable efforts by law offices to transform traditional overhead expenses, e.g., secretarial time to produce any given document, into a reimbursable expense payable by the es-

---

9. "In appearing in his professional capacity before a tribunal, a lawyer shall not … State or allude to any matter that he has no reasonable basis to believe … will be supported by admissible evidence." *Supreme Judicial Court Rule 3:07,* DR 7–106(C)(1).

10. The Court would appreciate it if, hereafter, when expenses are totalled by month, the expense items are also totalled across. This requires a change in the apparent local custom, but it would be helpful to the Court.

tate." *In re D'Lites of America, Inc.*, 92 B.R. 554, 555 (Bankr.N.D.Ga.1988).

Express delivery charges of $3,446.05 are not allowed because the necessity for the expense is not demonstrated. It should be noted that, for the same nine month period, P & D charged only $487.95 for postage. Not everything absolutely positively has to get there overnight, or quicker.

Telecopies charges of $2.50/$3.00 per page, *P & D Supplement* § 1b, aggregating $10,772.00, are not allowed.

With these adjustments, P & D is awarded an interim fee of $1,045,143.50, plus reimbursement of expenses in the amount of $41,110.03.

*Coopers & Lybrand*

On February 15, 1991, the Court allowed the employment of Coopers & Lybrand ("C & L") as accountants to the interim trustee *nunc pro tunc* to February 13, 1991. On June 21, 1991, C & L resigned as accountants, citing a conflict due to its representation of FDIC and Resolution Trust Company ("RTC"). C & L itemizes time entries demonstrating that it had accrued fees of $688,847.75 at its stated rates. The requested compensation for services is $550,000.00 and for expenses is $8,566.99. The fee for services was reduced from the full amount:

> As a result of discussions with Dr. Ben Branch, the Successor Trustee, Coopers & Lybrand has agreed to seek fees of $550,000 for professional services rendered to the Trustees.... The discount was agreed to as consideration for any duplication of efforts and start up costs which may have resulted from our resignation as accountants to the Trustee.

*C & L Application* § 4.

The first concern of the Court is whether C & L should be allowed any compensation at all. It has recently vacated the order authorizing employment of an appraiser when it was demonstrated that the firm was not disinterested. *In re Brown*, No. 91–12022–WCH (November 6, 1991). Alternatively, § 328(c) provides that this Court "may deny allowance of compensation for services and reimbursement of expenses of a professional person ... if, at any time during ... employment ... such professional person is not a disinterested person, or represents or holds an interest adverse ... to the estate."

The Court is satisfied by the explanation given by C & L in its response. *C & L Response* § A. The Court will accept the reduction in fees as a suitable response to the problem. Unfortunately, that is not the end of the matter.

With regard to the application itself, the Court is first concerned that there may have been overstaffing. For example, on February 13, 1991, three people billed for meetings at Palmer & Dodge for a total of 15 hours; on February 18, 1991, four people were at Palmer & Dodge for a total of 30 hours (there is some variation in the reasons given for the attendance of four people but not much); three people attended at Palmer & Dodge for a total of 16.5 hours on March 3, 1991. Without an explanation as to why all of the individuals were required, this Court cannot find that the services rendered on those occasions were reasonable and necessary.

Of much greater concern to the Court is a number of entries that do not correspond with other applications that have been presented to the Court. For example on February 13, 1991, Harvey Creem bills the account for a 3 hour meeting with the interim trustee. The interim trustee bills for 1.6 hours. It would appear that no appreciable travel time was involved on Mr. Creem's part, as he has no travel expenses. *C & L Response*, Ex. C2. Mr. Creem is Boston based. *Id.*, Ex. E.

On February 14, 1991, Mr. Creem again bills a meeting with the interim trustee, in this instance for 5 hours. The interim trustee bills it as 2.10 hours. On February 21, 1991 Chris Jenkins bills 9 hours for a meeting at Palmer & Dodge. F. Kingston Berlew of Palmer and Dodge billed the meeting at 5.10 hours. On February 15, 1991, Mr. Creem met with the interim trustee for 5 hours. The interim trustee reports that Creem met with him for 2.10 hours.

February 15, 1991, was the date of a reported meeting between Frank Doyle and P & D for a total of 6 hours. On that date P & D report only two events with regard to C & L for a total of 3.5 hours.

On March 5, 1991, David Green met with P & D for 13 hours. P & D met with him for only 10.6 hours. The following day's score was Green, 13; P & D 10.4.

On March 20, 1991, Thomas Montminy reports an 8 hour meeting with P & D. P & D notes a 1.3 hour meeting with accountants. This is the only P & D entry for the day which could relate to Mr. Montminy.

On April 30, 1991, David Green reported discussing tax matters with Andrews & Kurth for 2 hours. The "tax" section of the A & K application contains a parallel entry for only .5 hours.

The summary of the listed items is that C & L claims 64 hours of meetings as against 37.2 hours for the other participants. The "others" total only 58% of the C & L time.

There were a number of other entries which the Court could not balance against the reports of other participants, but the instances were not as clear cut or the discrepancies less significant. They have all been ignored for purposes of this discussion.

It is impossible for the Court to determine whether these entries are the result of carelessness or a deliberate attempt to mislead the Court. Whatever the reason for the problems, the data provide insufficient information to justify the fee claimed.

Additionally, a suspiciously large number of hours appear to have been rounded out to full hours in contravention of the local rule that requires calculation to the tenth of an hour. The Court understands that C & L's computer only recognizes quarter-hour increments. *C & L Response* § 8. This guarantees that any fee application filed in this Court will be subject to scrutiny not otherwise necessary. The computer seems resistent to quarter hours as well. Here follows, out of an itemization of 3,628.75 hours of professional services, every entry at .25 hours:

| Date | Person | Item | |
|------|--------|------|------|
| 2/27/91 | L. Wyeth | Phone call to Judy Nagel | .25 |
| 3/05/91 | B. Colucy | Tax research on bankruptcy case | .25 |
| 3/14/91 | A. Lobosco | Administrative support | .25 |
| 3/20/91 | J. Weiss | Administrative support | .25 |
| | | | 1.00 |

There are numerous entries that will merely state that there was a meeting without offering the Court an explanation as to the necessity. Other such non-descriptive entries include "tax analysis", "FDIC issues", "leveraged leases". There are numerous entries for the typing of Patty Ferris, the photocopying and filing of Houry Youssoufian, the photocopying and setting up files of Shawn Vadala, staff supervision by various individuals, and administrative support by certain individuals. All appear to be in classifications which this Court has held are overhead.

To paraphrase Judge Shiff, it is not this Court's obligation to produce coherent data to support fee applications, and C & L submits a deficient application at its peril. *In re Wonder Corp. of America*, 72 B.R. 580, 590 (Bankr.D.Conn.1987), *aff'd* 82 B.R. 186 (D.Conn.1988). Without spending nonexistent Court resources to track down every entry, correlate them against other fee applications, and to delete those entries insufficiently substantiated, the Court will take a "rough justice" approach and reduce the fee awarded by 42% of the $550,000.00 sought, that being the percentage of overbilling perceived as noted above. The combination of that discount plus the discount voluntarily taken should cover the other questions which the Court has about the application. The fee awarded is $319,000.00.

As for the expenses, C & L provided a per person breakdown of $8,566.99 in expenses, but without support. Giving the benefit of the doubt to C & L, the Court will allow all but $1,695.77 in meals, $212.94 in "sundry," and $294.43 of "other." This reduces the expenses allowed to $6,363.85.

*Shea & Gardner*

The Court authorized the application of Shea & Gardner ("S & G") on April 2, 1991. S & G seeks compensation for services in the amount of $229,122.50 and for expenses in the amount of $15,010.25 for the period from March 26, 1991 through August 31, 1991.

> The Court agrees with Judge Carter that neither § 327 nor the Bankruptcy Rules by their terms, or by any necessary implication, prohibit the court from exercising its sound discretion in deciding whether to approve employment of a professional after the fact to the end that the deserving professional may be compensated by the estate for valuable services performed for it.

*In re Cormier,* 35 B.R. 424 (D.Me.1983). The application which was granted retaining S & G is not a *nunc pro tunc* order, and services were performed between the date of the entry of the application and the granting of the relief sought. It has been the custom of this Court to treat services rendered in the few days prior to the entry of an order authorizing employment subsequently entered as having been performed under an unspoken *nunc pro tunc* clause in the order. However, the Court recognizes that this is not the best possible practice, although it does save much time and paper, and it urges counsel to spare it the exercise in the future.

The Court authorized the employment of S & G as special counsel. According to their application, there are six areas of activity in which they performed services: (1) litigation to secure financial tax planning; (2) proof of claim preparation; (3) litigation memorandum to the trustee; (4) administrative proceeding involving Maine National Bank; (5) trustee's efforts to provide for interim compensation for professionals; (6) miscellaneous.

As to the first category, there was a certain amount of overlap with Palmer & Dodge, but not such an amount as to require any discount.

As to the fifth category, it involved the following services:

> In light of the size of the estate, and the number and complexity of the tasks the Trustee wishes his retained professionals to undertake, the Trustee on April 8, 1991, filed an expedited motion seeking (among other things) an Order Setting Guidelines for Compensation of Trustee and Professional Persons. The motion proposed a schedule for interim compensation every 60 days and requested the Court to notify the professionals whether it intended to cap or disallow any particular fees or costs. The Court denied the motion, without a hearing, on April 26, 1991.
>
> The Trustee then filed (on May 10) a Motion for Renewed Consideration For Establishment of Procedures [etc.]. The motion was supported by both the U.S. Trustee and the Unsecured Creditors' Committee.... The Bankruptcy Court denied the motion without a hearing by Order dated June 7, and entered June 14, 1991.
>
> S & G then filed an appeal on the Trustee's behalf of that order under Bankruptcy Rule 8003. (App. 25.) Its efforts in that regard included researching and briefing the law under Bankruptcy Code § 331 regarding interim compensation of professionals in large and complex bankruptcy cases.

*S & G Application* § 5.

The Court denies the requested fees of $24,665.00 for two reasons.

■ First, S & G was specifically retained "with respect to certain specific matters involving the Federal Deposit Insurance Corporation ("FDIC") and related regulatory agencies." *Application for Order Approving the Trustee's Retention of Shea & Gardner* § 3. The services described in no way fall within the bounds of the representation authorized.

■ Second, this Court has previously held that fees for work performed for the benefit of someone other than the debtor will not be allowed. *In re Clamp–All Corporation,* No. 89–12785–WCH (October 5, 1991). The interim fee services described were solely for the benefit of the parties seeking expanded rights to interim compensation and in no way benefit the estate.

Despite an obvious wealth of pleadings, not even one photocopy is charged to the above activity. All of the expenses of the account are carried under the "general" category. Lacking any other method, the court will ratio the fees sought regarding the interim fee issues ($24,665.00) against the total fees sought ($229,122.50) and apply the resulting percentage (10.76%) against the total allowed disbursements calculated below. This results in a deduction of $1,359.30.

The final consideration is S & G's failure to bill in tenths of hours as required by the local rule. Once again, the Court is advised that the firm's computer cannot presently cope with less than quarter hour intervals. S & G suggests that the quarter hour procedure actually saves the estate money, since fractional quarter hours are rounded down. That could well apply to entries in excess of .25 hours, but it cannot apply to them. Study of the time records indicates that this is a *de minimis* problem, and it will not be further considered.

However, this is not an authorization to violate the local rule and, in appropriate cases, appropriate adjustments will be made.

As was the case with other fee applications, certain expenses will be disallowed. Telecopier charges of .50 cents per page ($321.00), an unsubstantiated "RMW ticket" of $1,049.00, and courier services ($1,007.42) are deducted from the $15,010.25 sought, as is the expense factor with regard to the interim fee activity computed above ($1,359.30). This leaves a net total of $11,273.53.

The final line is that S & G is awarded an interim fee of $204,457.50 and reimbursed costs of $11,273.53.

An order reflecting these awards will be entered.

ORDER REGARDING INTERIM FEE APPLICATIONS OF ACCOUNTANT TO TRUSTEE, COUNSEL TO TRUSTEE, CHAPTER 7 TRUSTEE INTERIM TRUSTEE, COUNSEL TO THE INTERIM TRUSTEE, ACCOUNTANT TO THE INTERIM TRUSTEE, AND SPECIAL COUNSEL TO THE TRUSTEE

In accordance with the foregoing decision, interim fees and expense reimbursements are ordered as follows:

| Applicant | Interim Fee | Travel Time | Expenses |
| --- | --- | --- | --- |
| BDO Seidman | $ 119,331.80 | | $ 2,647.82 |
| Andrews & Kurth | 1,133,188.85 | $44,827.00 | 128,620.91 |
| John Whitlock | 14,357.87 | | |
| Ben S. Branch | 155,520.00 | | |
| Palmer & Dodge | 1,045,143.50 | | 41,110.03 |
| Coopers & Lybrand | 319,000.00 | | 6,363.85 |
| Shea & Gardner | 204,457.50 | | 11,273.53 |

EXHIBIT A

Bank of New England Corporation
and Subsidiaries
Organizational Chart

Seized by Regulators on January 6, 1991